**David PASTOUR and Doris Pastour, Appellees,**

v.

**KOLB HARDWARE, INC., and Thermogas Company, Appellants.**

**No. 53224.**

Supreme Court of Iowa.

Dec. 9, 1969.

Boyle & Schuler, Clear Lake, for Kolb Hardware, Inc., appellant.

Levinson, Bryant & Enabnit, Mason City, for Thermogas Co., appellant.

Hobson, Cady & Drew, Hampton, for appellees.

MOORE, Chief Justice.

This is an action at law against suppliers of liquid petroleum gas for damages to plaintiffs' farm home and contents on March 20, 1964 as a result of a high pressure fire which started in their kitchen stove. Defendants have appealed from judgment on verdict for plaintiffs. We affirm.

For approximately 20 years prior to March 20, 1964 plaintiffs, David and Doris Pastour, husband and wife, owned a farm two miles east of Alexander and occupied the seven room frame house located thereon. Their original kitchen stove which used LP gas was purchased and installed in 1948. Their first fuel supplier, Muhlenbruch Hardware Company, sold out to defendant Kolb Hardware, Inc., in 1959. The sale included transfer of ownership of a regulator and two gas tanks or cylinders being used on plaintiffs' premises. The same regulator was furnished from 1948 until the fire. The tanks were changed as a new supply of gas was needed. In 1960 plaintiffs purchased a new Tappan four burner LP gas stove which was installed together with new tubing by the vendor, Elliott Hardware Company. A location change of the stove necessitated moving Kolb's regulator and tanks. Without interruption Kolb continued to furnish the same regulator and delivered new tanks of gas as needed. Kolb delivered and

installed one gas cylinder to plaintiffs' home on October 23, 1963 and a second cylinder on December 24, 1963. They were in place at the time of the fire. At no time did plaintiffs attempt to adjust or tamper with the regulator or cylinders. They were cared for only by Kolb's employees.

When Kolb had on hand several empty cylinders an employee hauled them to the plant of defendant Thermogas Company at Mason City where they were exchanged for 100 lb. cylinders which Thermogas had filled with LP gas. This arrangement between defendants had been carried out for several years before the event here involved.

On the morning of March 20, 1964 Mrs. Pastour used the stove for cooking breakfast and again used it in preparing the noon meal. As it had done for several years, the stove functioned properly. About five forty that afternoon while her husband was in the kitchen Mrs. Pastour went to the stove to make coffee. As she had always done before, she turned on a burner. To her surprise flames roared eight to twelve inches high. She immediately turned off the burner and it went out. When the burner flamed up she was frightened and startled. She walked across the kitchen from the stove to telephone Kolb but decided to turn it on again before making a call. When she turned the burner on a second time it again flamed and roared "real loud". Her attempt to shut it off was in vain. Flames were not only shooting from the burner but from the pilot light and under the entire top of the stove. The flames shot up and out the back of the stove. Curtains were set on fire. Mr. Pastour ran out of the kitchen to shut the gas off at the tanks. Mrs. Pastour was unable to reach the fire department on the telephone. She then went to the kitchen sink and began throwing water on the flames. She was then blown out the kitchen door. She was blistered around her hairline and her hair singed. She testified: "It just went 'whoof' and I was right out the door." The inside of the kitchen was engulfed with flame and smoke. The house was damaged beyond repair.

Her later direct examination includes the following:

"Mr. Cady: Now, then, describe the explosion a little more in detail and what happened? Mrs. Pastour: Well, it was just like a big ——

"Mr. Boyle: Excuse me. We move to strike the word 'explosion' as having been injected by counsel, there never yet having been any testimony by this witness in regard to any explosion.

"The Court: The objection will be overruled.

"Mr. Cady: You may answer the question, Mrs. Pastour. A. Would you repeat the question?

"Q. Would you describe the explosion that occurred. A. Well, it was just like a big puff; more of a pressure like.

"Q. What happened so far as you were concerned? A. I just went right out the door.

"Q. Were you pushed out the door? A. That's what it seemed like." The inside door was open. She was blown out the closed outside kitchen door.

A few days after the event here involved a Kolb employee at the direction of Thermogas' manager removed the two cylinders or tanks and the regulator and took them to Kolb's place of business.

Several weeks after the event an experienced appliance repairman made a visual inspection of the stove in the kitchen where it had remained unmoved. He checked the connections and tubing from where the regulator had been and run to the stove. They were in normal condition. He removed the tubing and took it to his shop for testing. No breaks or defects were found.

Dr. Lionel K. Arnold, a Professor of Chemical Engineering at Iowa State

University of Science and Technology, was called as a witness by plaintiffs. He has many degrees including Master of Science. He has been a member of the staff at Iowa State since January 1926. His teaching includes lectures to fire fighters. Through the years he has inspected the sites of various fires and explosions for lawyers, insurance companies, gas companies and municipal officers. His experience and competency are not challenged here.

His testimony summarized in the record includes: "I have had experience with the problems of gasses and the behavior and utilization of the various gasses. I have studied natural gasses and these manufactured propane gasses. I am familiar with the explosive qualities of gasses and what causes them to explode.

"Q. Why do various gasses explode? What causes it? A. Well, you might say an explosion is really a very rapid burning in which you get expansion of gasses from the products of combustion or burning and these spread out and if they are confined may build up to quite a little pressure and cause quite a little damage. The pressure which you get depends upon the relative amount of the gas and oxygen present and also on how the gas is confined and, of course, on the specific gas itself. * * * I have studied gas regulators, gas bottles and containers and that type of thing. I have examined a number of them. We use them around the laboratory. We have to be familiar with them. I have taken regulators apart. I understand the function of a regulator and the operation of a regulator. I have looked at these LP gas cylinders, hundred-pound gas cylinders. I have examined them and checked them over, given them visual inspection. I am familiar with the regulators for liquid petroleum gasses as are manufactured by the Fisher Governor Company. I am familiar with the Model 923, liquid petroleum gas regulator. * * * The pressure, or the gas that is in these large gas tanks, is under a great deal more pressure than the stove requires. The gas regulator de-termines what the pressure is and the amount of gas that goes into the burning unit. * * *

"Q. Have you read studies of the various gasses to determine whether or not there are ever foreign substances in any of the gasses, or is it possible? A. Oh, it is entirely possible. As these gasses are produced or separated from the other constituents, they may have, and usually do have, foreign substances mixed with them. * * *

"Q. Is it possible for these foreign substances to form scales or chips and get into the regulator and prevent its proper functioning, or cause it malfunctioning? A. If these were present in the gas in the cylinders, yes. * * * It is entirely possible that the foreign substances that might be in the regulator could cause the regulator to not close. * * *

"Q. Now, Doctor Arnold, I have a rather long question here. Assume that you have a frame home, farm home, of frame construction. The gas being supplied to a four-burner LP gas range equipped with a pilot light, a Tappan range. The gas being supplied from two one hundred pound gas cylinders of LP gas propane which was equipped with a Model 923 Fisher regulator with a double-acting check valve. The gas being brought into the kitchen from the tanks through the regulator, then into the copper tubing into the stove. And assume that the copper tubing and connections to the stove were sound and tight. And further assuming that the operator of the stove turned on the right front gas burner of the stove, and thereafter the burner's flame shot upward approximately eight to twelve inches and had a roaring sound thereto and that the operator then turned the burner off and the flame went down and then immediately or shortly thereafter turned the burner on again and the flame from the burner shot upward again approximately eight to twelve inches and once again had a roaring sound. Assume further that the operator thereafter

closed the burner valve and that the burner continued to burn with the same high level of flame eight to twelve inches and assume that the fire seemed to spread to the rear of the stove under the lid of the stove and assume that the operator of the stove then threw water on the fire attempting to extinguish it and assume that the flames continued to spread and a moment thereafter, an explosion occurred, thereby damaging the house, and contents beyond repair. Doctor, assuming the facts as stated in this question to be true, do you have an opinion as to the cause of the fire and explosion which occurred at this time and place? A. Yes.

"Q. And what is your opinion as to the cause of the fire and explosion?

"Mr. Boyle: We object to the question put to the witness for the reason that it is calling for an opinion and conclusion of the witness upon which there in no foundation based to qualify this witness to answer that hypothetical question. We further object for the reason that the question assumes facts which are not in the record, and does not include all material facts which are in the record, and that the question is calling for a speculative answer from this witness.

"Mr. Enabnit: We join in the objection.

"The Court: The objection is overruled.

"A. Well, in my opinion, it resulted from faulty regulator operation.

"Q. Dr. Arnold, just what can go wrong with a regulator, gas regulator? Will you come down here and use this picture and explain to the jury what can go wrong to cause them to not function properly?

"Mr. Boyle: This is objected to as repetition. It is irrelevant and immaterial as to what can go wrong with any regulator. This good doctor has already given his opinion in this matter, and it is irrelevant and immaterial at this time, repetitious, and already gone into about regulators.

"The Court: Overruled.

"A. Well, the thing that causes most of the trouble from the standpoint of regulators allowing gas to go through when they should not is getting solid particles in here (indicating on Exhibit 3, on blackboard) at this point between the orifice, edge of the orifice there and your plastic disk that you have here. Now, these solid particles can hold this open and allow the gas to escape and, of course, the amount that escapes depends upon how big a chunk you get in there. * * *

"Q. Now, Doctor, from your experience with gas and gas stoves, regulators, LP bottle gas, what can cause a sudden high flame in a burner of a gas stove to suddenly come up and flame high, eight to twelve inches, other than a faulty regulator?

A. I do not know of anything else."

Regarding his visit to plaintiffs' premises Dr. Arnold stated: "Well, it was in July, I believe the 24th of July, and I believe it was following the explosion, the fire which occurred, as I remember it, sometime in March. I entered the house. The stove was in the house. The parts were in place on the stove, as far as I can recall. So far as the burners were concerned, they were still in place. The pilot light was in place. I had to use some tools to get it loose. If the pilot light had been moved, it would have to have been bolted back into place so I am sure it was not. The burners may have been moved slightly from where they normally were because they could have been moved more readily. I took the burners and the pilot light back and examined them. I tested them. I examined them visually at the farm. I had no means of running actual tests on them at the farm. When I took them to the University, I connected them to a source of LP gas to determine if they would operate.

"Q. What did you find to be the case as to whether or not they would operate? * * * A. I was able to light the burners and they burned normally and the pilot light also.

"Q. They burned normally? A. Yes sir."

Dr. Arnold went to Kolb Hardware where he was permitted only to look at the regulator and two cylinders without touching them. He was not allowed to make any tests of them. He observed the regulator was a Fisher Governor 923.

Vincent Kolb, manager of defendant Kolb Hardware, Inc., described the operational methods employed by obtaining filled LP cylinders or tanks from Thermogas and testified each container remained unchanged until delivered and connected with a regulator at the customer's premises. He stated the regulator and two cylinders removed from plaintiffs' premises were tested at Kolb Hardware in his presence by Donald R. Browning, manager of defendant, Thermogas Company, and when connected to a gas plate they functioned normally. Mr. Browning also testified likewise and that no moisture or particle was found in the regulator. No defect was found in the regulator.

Alvin Koenen, Kolb's deliveryman, described the method employed in changing tanks. He testified he usually blew out the "pigtails" connecting the cylinder with the regulator and described his practice of opening the valve on the cylinder before connecting it to the regulator. He stated this was done "because there could be little dust particles from standing on the dock, and by opening the valve, this would blow them out."

Herman Janssen, one of the firemen called to the scene, testified he observed the house after the fire and "I did not observe anything indicating that there had been an explosion".

Donald Irwin, an engineer in the design section of Fisher Governor Company, manufacturer of the 923 regulator referred to herein, as a witness called by defendants, described its function and method of operation. His testimony includes:

"Q. Now, Dr. Arnold spoke yesterday about the fact that these regulators can go out of kilter by certain sediment around the, there is a seat, something like a seat— A. Around the orifice, this is true. If there is foreign material that enters the regulator, in through the pigtails or however it might get into the regulator, these self-contained regulators, any foreign particles in these regulators seem to have an affinity for this seat lining. If I knew the reason, I'd be a rich man right now. At any rate, they seem to have an affinity for this seat lining and they gravitate right into this seat area. Now, crimped into this brass metallic holder is a Buna N composition seat. Now, a Buna N is a poly—an artificial manufactured rubber. Crimped in here is this rubber seat, and, of course, the purpose of the rubber seat is to close the orifice. Now, if we do get some foreign particles come through here and they lodge at this seat area, they can build up to the point where the regulator can no longer close off or shut off against these small particles. Naturally, then if this cannot close off, if the disk cannot close against the orifice and shut off the flow, there is an increase or build-up of pressure in this lower case, and also in the downstream pipe until such point as it overcomes this relief valve spring. * * * I have had training to determine whether or not parts of the 923 regulator have been subject to high pressure. We determine these pressures in our laboratory. In other words, in the development and in the normal production testing of the regulator, we determine at what overpressures we should have failures of the internal parts of the regulators. I am able to determine from the inspection of the interior component parts whether or not they have been subject to excessive pressure. From my examination of the regulator, Exhibit 'B', basing my answer upon experience and training, and the tests which I have partaken in, I have determined that Exhibit 'B', the regulator in this case, has not been subject to high pressure."

His cross-examination includes: "I have examined this regulator and could tell that

there had been no pressure over three pounds, but I would say that there could have been three pounds of pressure. That would have been six times as much gas as normal, and I don't know whether you could say that could cause an eight to twelve inch flame from the burner. You would get some increased flame, but whether it would be eight or twelve inches, I don't know."

He further testified a recent trade publication stated: "Chips of dirt, pipe scale and other foreign materials cause 95 per cent of all regulator trouble."

Donald R. Browning, general manager of defendant, Thermogas Company, testified they have many retailers who like Kolb Hardware dropped off empty cylinders and picked up those which had been filled by Thermogas from tank cars of LP gas purchased from the manufacturer, Warren Petroleum Corporation of Tulsa, Oklahoma. The cylinders varied in age from almost new to twenty five years old. They were stored on Thermogas' dock and distributed to retailers, after being filled, without regard to individual ownership. In other words the cylinders were rotated to the retailers without regard to ownership of any individual cylinders. He stated: "No they are not checked as they are brought in for foreign substances in the bottles." He stated they are visually inspected after ten years use. The record does not disclose whether the two tanks which were in use at plaintiffs' home had ever been so tested. He testified substantially the same as Kolb regarding having the regulator and two cylinders picked up, taken to Kolb Hardware and the subsequent testing.

At the close of the evidence the trial court overruled the motion of each defendant for directed verdict. The trial court withdrew Count I of plaintiffs' petition based on certain pleaded specifications of negligence and submitted Count II as against both defendants alleging general negligence and relying on the doctrine of res ipsa loquitur. The jury returned a $13,000 verdict against both defendants.

The jury answered each of the following interrogatories in the affirmative: "Do you find defendant Kolb Hardware, Inc., liable to the plaintiffs for said damages? Do you find the defendant Thermogas Company liable to the plaintiffs for said damages? If you find the plaintiffs entitled to recover against more than one defendant, do you find the recovery based upon common liability in that the negligence of said defendants concurred or combined to cause the injury to the plaintiffs?"

Following denial of each defendant's separate post verdict motions each has appealed and filed separate but very similar briefs and arguments.

Their assignments of errors are basically the same and may be summarized as asserting the trial court erred in (1) overruling each motion for directed verdict, (2) submitting this case to the jury under the doctrine of res ipsa loquitur, (3) failing to find as a matter of law plaintiffs were guilty of contributory negligence and assumed the risks in turning the stove on a second time, (4) giving instruction 7, (5) permitting Dr. Arnold to answer the hypothetical question, (6) overruling the post verdict motions, and (7) allowing plaintiffs' counsel to include the word "explosion" in his question to Mrs. Pastour. They are not considered in the order assigned.

█ I. Defendants argue the incident resulting in major damage to plaintiffs' home should not have been referred to in the question to Mrs. Pastour and in instruction 7 as an "explosion". Counsel suggests it should have been referred to as a "flash fire" or a "whoof". We find no prejudicial error in the use of the word "explosion". It seems clear reference was being made to the event resulting in Mrs. Pastour being blown out the kitchen door and damage to plaintiffs' home.

The facts relating by Mrs. Pastour bring the event within the definition given by Dr. Arnold of an explosion. In his testi-

mony set out supra he refers to it as an explosion.

Supported by cited authorities, Black's Law Dictionary, Revised 4th Ed., pages 689, 690, sets out these definitions: "Explosion. A sudden expansion of a liquid substance with result that gas generated by the expansion escapes with violence, usually causing a loud noise. * *

"The word 'explosion' is variously used in ordinary speech, and is not one that admits of exact definition. Every combustion of an explosive substance, whereby other property is ignited and consumed, would not be an 'explosion', within the ordinary meaning of the term. It is not used as a synonym of 'conbustion'. An explosion may be described generally as a sudden and rapid combustion, causing violent expansion of the air, and accompanied by a report. But the rapidity of the combustion, the violence of the expansion, and the vehemence of the report vary in intensity as often as the occurrences multiply. Hence an explosion is an idea of degrees; and the true meaning of the word, in each particular case, must be settled, not by any fixed standard or accurate measurement, but by common experience and notions of men in matters of that sort. * *."

II. Defendants' contention the court erred in overruling their objections to the hypothetical question propounded to Dr. Arnold is without merit. Their objections were only general and failed to meet the requirements of a proper objection to a hypothetical question.

The rule is well established in this court that counsel who object to a hypothetical question on the ground it contains statements not shown in the record or omits statements from the record has the duty to advise the court in what particular respect it fails to state the record properly so the adversary may have an opportunity to remedy the alleged defect, if possible, by correcting or eliminating statements objected to. Reversible error may not be predicated upon an objection which does not tell the court the ground upon which it is based. Deaver v. Armstrong Rubber Co., Iowa, 170 N.W.2d 455, 462; Daniels v. Bloomquist, 258 Iowa 301, 309, 310, 138 N.W.2d 868, 873, 874, and citations in each. See also 58 Am.Jur., Witnesses, section 858; 88 C.J.S. Trial § 124.

III. Defendants argue the trial court should have directed a verdict in their favor at the close of the evidence on the grounds the record showed plaintiffs were guilty of contributory negligence and of voluntary assumption of risk as a matter of law. This cause arose in 1964 and was tried without objection on plaintiffs' pleaded freedom from contributory negligence and defendants' pleading alleging plaintiffs' assumption of risk. The court instructed on these two issues to which no objections were made.

In Smith v. Ullerich, 259 Iowa 797, 802, 803, 145 N.W.2d 1, 4, 5, we say: "It is only the exceptional case in which the issue of freedom from contributory negligence should not be submitted to the jury— only where such negligence is so palpable, flagrant and manifest that reasonable minds may fairly reach no other conclusion; if there is any evidence tending to establish plaintiff's freedom from contributory negligence, the question is one of fact for the jury and the doubts should be resolved in favor of such submission. Goman v. Benedik, 253 Iowa 719, 721, 113 N.W.2d 738, 739, and citations."

Mere lack of care, without more, does not amount to assumption of risk. The doctrine involves a choice between a course known to be dangerous and one that is not. It is not based on negligence but the voluntary assumption of the danger by plaintiff with full knowledge thereof. It cannot logically be held that one has deliberately chosen a dangerous course of which he is ignorant merely because he should have known of it. Bohnsack v. Driftmier, 243 Iowa 383, 392, 393, 52 N.W.2d 79, 84, and citations; Barnes v. Gall, 251 Iowa 921,

927, 103 N.W.2d 710, 714; Kennedy v. Bennett, 8 Cir., 261 F.2d 20, 25.

 Assumption of risk is ordinarily a question of fact. Hull v. Bishop-Stoddard Cafeteria, 238 Iowa 650, 690, 691, 26 N.W. 2d 429, 451, and citations. Defendants here had the burden of proof on the question of assumption of risk. Rule 344(f)5, R.C.P.

Mrs. Pastour's testimony includes: "The first time I turned the burner off, the flame responded to turning the burner off, that's correct.

"Q. The second time, were you fearful or have an apprehension as to what would happen when you turned it on? A. No. I turned it off the first time so I thought it would turn off the second time, I turned it off."

 The facts here do not support defendants' contention contributory negligence and assumption of risk had been established as a matter of law. Defendants were not entitled to a directed verdict on these grounds.

IV. Defendants throughout the proceedings in the trial court and in each brief filed and argued before this court strongly assert the evidence does not support submission of this cause to the jury under the doctrine of res ipsa loquitur. It presents the most difficult problem on this appeal.

Volumes have been written by this court and by courts in other jurisdictions involving the doctrine. Our cases and the many facets of res ipsa loquitur are exhaustively reviewed in 18 Drake Law Review, Volume 1, pages 1 through 25, December 1968, in the article "Res Ipsa Loquitur in Iowa" written by Alan Loth, well known author and member of the Iowa bar.

These propositions are now well established.

 Under the doctrine of res ipsa loquitur, where (1) injury is caused by an instrumentality under the exclusive control of defendant and (2) the occurrence is such

as in the ordinary course of things would not happen if reasonable care had been used, the happening of the injury permits, but does not compel, an inference defendant was negligent.

 Whether the occurrence is such as would not happen if reasonable care had been used rests on common experience and not on evidence in the particular case that tends to show the occurrence was or was not the result of negligence.

 In most cases that apply the doctrine of res ipsa loquitur, a rule of evidence, the instrumentality is under defendant's exclusive control at the time the injury or damage occurs. It does however apply where defendant was in exclusive control of the instrumentality at the time of the alleged negligent act, although not at the time of the injury or damage, provided plaintiff first proves there was no change in the condition of the instrumentality after it left defendant's control which could reasonably have caused the injury or damage.

Our more recent cases which discuss, recognize and apply the foregoing principles are Sweet v. Swangel, Iowa, 166 N.W. 2d 776, 778; Bradt v. Grell Construction, Inc., Iowa, 161 N.W.2d 336, 344, 345; DeMoss v. Darwin T. Lynner Construction Co., Iowa, 159 N.W.2d 463, 465, 467; Boyer v. Iowa High School Athletic Ass'n, 260 Iowa 1061, 1065–1068, 152 N.W.2d 293, 296, 297; Smith v. Ullerich, 259 Iowa 797, 804, 145 N.W.2d 1, 5; Thompson v. Burke Engin. Sales Co., 252 Iowa 146, 148–153, 106 N.W.2d 351, 353, 355, 84 A.L.R.2d 689. In Burke we held res ipsa loquitur applied where a large piece of metal ceiling fell on plaintiff 13 months after defendant completed the ceiling.

 In Schneider v. Keokuk Gas Service Co., 250 Iowa 37, 41, 92 N.W.2d 439, 441, which holds the res ipsa loquitur doctrine is applicable to cases involving escaping gas, we say: "While it is conceded that natural gas is a highly dangerous com-

modity, common experience tells us that ordinarily an explosion will not happen if due care has been exercised in the control thereof."

■■■ V. Neither defendant raises any question of a duty owed to plaintiffs or the fact the doctrine of res ipsa loquitur was applied in this case involving multiple defendants. The following however should be noted.

In 26 Am.Jur.2d, Electricity, Gas, and Steam, section 244, page 453, the editor states: "There is authority that a seller or distributor of liquid or bottled fuel gas must use a degree of care to prevent the escape of such gas from its pipes and containers commensurate to the danger which it is its duty to avoid, and if it fails to exercise such degree of care, and injury results therefrom, it is liable for damages suffered thereby, provided the persons suffering the injury or damage is free from contributory negligence. Some cases express the view that a distributor of liquid gas must exercise a high degree of care to see that no person is harmed in its distribution and while it is under the distributor's control. Other cases speak in terms of a duty to exercise reasonable care under the circumstances.

A manufacturer of liquid petroleum gas has been held liable for injuries caused by such commodity to persons who might expect to use it, notwithstanding that the manufacturer may have employed some middleman, either as agent or independent contractor, to market it."

In the Annotation entitled "Res Ipsa Loquitur—Multiple Defendants", 38 A.L.R. 2d at page 906, the author says: "As a general rule, the doctrine of res ipsa loquitur has been applied against multiple defendants where they have been properly charged as joint tortfeasors or have been in joint control of the instrumentality or agency causing the injury, or where one was vicariously liable for the other's negligence; and the doctrine has not been applied where

none of these alternative conditions existed."

VI. The trial court in instruction 7 set out the applicable law regarding plaintiffs' burden to prove the foundation facts on which the doctrine of res ipsa loquitur may be applied. The question of Thermogas' liability was carefully limited by the last paragraph of instruction 7 which states: "You are further instructed that under the evidence in this case the defendant Thermogas Company cannot be held liable for any defect, if any, in the regulator for there is no evidence which shows that said defendant, Thermogas Company, at any time had said regulator under its control. However, if you find that the regulator did, in fact, malfunction and that said malfunction was occasioned as a result of a substance or substances being in the L. P. gas, or the cylinders containing the same, then and in that event the same would not be a defect in the regulator as the word 'defect' is used in the preceding sentence."

The jury verdict and answers to the special interrogatories lead to the conclusion the jury found general negligence against both defendants. They shared the responsibility for the gas which left the cylinder and went into the regulator.

Under the record, set out in detail, supra, we conclude the trial court did not err in submitting plaintiffs' claim against each defendant under the doctrine of res ipsa loquitur.

■■■ VII. In addition to the court's use of the word "explosion" in instruction 7 each defendant objected thereto on the grounds it did not fully apprise the jury of the nature of proof as to foundation facts for the application of the doctrine of res ipsa loquitur. From our careful reading of the instruction we must disagree with this contention.

IX. Defendants' motions for directed verdict, for judgment notwithstanding the verdict and for new trial are based on the

several contentions made by defendants which we have considered and decided supra. We find no error in the trial court's denial of these motions.

We find no reversible error.

Affirmed.

All Justices concur, except REES, J., who takes no part.