339 So.2d 390 (1976)
Don H. SCHMIEDER and 12055 Airline Corporation
v.
STATE FARM FIRE AND CASUALTY COMPANY.
No. 10841.
Court of Appeal of Louisiana, First Circuit.
September 20, 1976.
Rehearing Denied November 15, 1976.
Writ Refused February 1, 1977.
David W. Robinson, Baton Rouge, of counsel, for 12055 Airline Corp.
Charles W. Roberts, Baton Rouge, of counsel, for Don H. Schmieder.
Horace C. Lane, Baton Rouge, of counsel, for State Farm Fire and Cas. Co.
Before LANDRY, COVINGTON and PONDER, JJ.
LANDRY, Judge.
Don H. Schmieder d/b/a 12055 Airline Corporation (Appellant) appeals from judgment dismissing Appellant's claim against *391 defendant State Farm Fire and Casualty Company (Insurer) for payment allegedly due Appellant pursuant to a builder's risk policy issued by Insurer on a building under construction by Appellant. The precise question presented is whether a builder's risk policy which insures against loss by "explosion" covers the collapse of a building due to structural defects. The trial court answered the query adversely to Appellant. We affirm.
On the afternoon of September 30, 1974, Appellant was engaged in the construction of a building located on the east side of Airline Highway and bearing municipal number 12055 Airline Highway, Baton Route, Louisiana. The structure was made of concrete walls. The front or western portion of the structure consisted of two stories; the rear or eastern part was one story high. On the date in question the building was almost complete; workmen were laying carpet in the structure, landscaping the grounds, and completing installation and testing of the air conditioning system. Occupancy of the structure was anticipated within approximately one week. The building's roof was made of concrete slabs. The intermediate floor of the two story portion (ceiling of first story and floor of second story) was also constructed of pre-fabricated concrete slabs. The main entrance to the building was situated on the north side near the northwest corner of the structure. Near the entrance was a stair well beneath a stairway leading to the second floor. It is conceded that located in the stair well was a collection of paint, varnish, carpet glue and other similar products used in the building by the various crafts involved in its construction. There is also some evidence that one or more cans of gasoline were stored in this area. Near the stair well was situated a room measuring approximately ten by ten feet, on the north wall of which was installed the control panel for the building's electrical system.
At approximately 2:30 P.M. on the day in question, the building suddenly and unexpectedly collapsed with a loud noise. The west wall fell outward (westerly) almost in one piece, crushing several vehicles parked adjacent thereto. Glass from the windows was found beneath the fallen west wall and for some little distance beyond. While the wall at the southeast corner of the building also fell outward, the north wall remained standing. Upon the arrival of building inspector within approximately 15 minutes of the disaster, the standing north wall was ordered demolished to assist in the rescue of workmen believed trapped in the debris. The roof and rear wall of the two story section fell onto the intermediate floor which in turn collapsed under the weight. The roof of the rear portion also fell inside the structure. The rear or east wall of the one story section remained standing.
The original plans called for the intermediate floor to be supported by steel columns and framing. During construction the plans were changed to concrete columns and precast concrete slabs for the intermediate floor. This alteration caused concern regarding the ability of the walls to support the additional weight involved. As a precautionary measure, supporting brackets were installed in the west wall to support the roof and intermediate floor of the two story area. Following the collapse, the supporting brackets were found intact in place. The protruding ends of the reinforcement rods in the intermediate floor slabs were found to have been drawn out in the nature of pencil points. There is considerable dispute concerning whether the concrete roof slabs over the two story area contained reinforcement rods which extended to the ends of these slabs which overlapped and rested upon the west wall for support. The record overwhelmingly establishes that although there was much combustible material in the building such as paper, carpeting and cartons, none of such material showed any evidence of burning, charring or exposure to or damage from heat or fire following the collapse of the building.
The sudden collapse of the structure killed two or three workmen and injured several more. For all practical purposes the building was a total loss.
*392 The extended coverage provisions of the policy in question insures Appellant "against direct loss by windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles and smoke, except as hereinafter provided." The policy does not purport to define the term explosion as contained in the insuring clause. The policy does, however, expressly exclude the following from explosion coverage:
"This Company shall not be liable for loss by explosion of steam boilers, steam pipes, steam turbines or steam engines if owned by, leased by or operated under the control of the insured.
"The following are not explosions within the intent or meaning of these provisions:
(a) Shock waves caused by aircraft, generally known as `sonic boom'.
(b) Electric arcing.
(c) Rupture or bursting of rotating or moving parts of machinery caused by centrifugal force or mechanical breakdown.
(d) Water hammer.
(e) Rupture or bursting of water pipes.
(f) Rupture or bursting due to expansion or swelling of the contents of any building, caused by or resulting from water.
(g) Rupture, bursting or operation of pressure relief devices."
Resolution of this matter hinges upon the determination of two basic issues: (1) the meaning of the term `explosion' as used in the policy and (2) whether Appellant has established that the building collapsed as the result of an explosion as intended by the policy provision insuring against explosion.
So far as we are aware, the only case in our own jurisprudence to consider directly the definition of "explosion" as used in an insurance policy, is Levert-St. John, Inc. v. Birmingham Fire and Casualty Company, La.App., 137 So.2d 494. In the cited case it was held that where such a term is not defined in the policy, it must be interpreted in its ordinary sense as used and understood by laymen rather than by technicians and scientists. This holding is in accord with our codal rule of interpretation of agreements expressed in La.Civ.Code Art. 14, which provides that words of an agreement should be given their general and popular interpretation and not that which is strained and unusual. This rule of interpretation applies to insurance contracts and policies. Taylor v. State Farm Mutual Automobile Insurance Company, 248 La. 246, 178 So.2d 238.
A contract of insurance, like any other agreement, is the law between the parties. La.Civ.Code Art. 1901; Sumrall v. Aetna Casualty and Surety Company, La. App., 124 So.2d 168.
Courts must give legal effect to the provisions of an insurance policy according to the true intent of the parties, which is determined by the wording of the policy when its provisions are clear and unambiguous and do not lead to absurd consequences. La.Civ.Code Arts. 1901, 1945; Bunch v. Frezier, La.App., 239 So.2d 680.
The words employed in an insurance policy are to be understood in their common and usual significance without attending so much to grammatical rules as to general and popular use. Taylor v. State Farm Mutual Automobile Insurance Company, above; Harmon v. Lumbermens Mutual Casualty Company, 247 La. 263, 170 So.2d 646.
Our research indicates that in seeking to ascertain the meaning of "explosion" in its ordinary meaning, most courts tend to employ a standard dictionary definition of the term. See 28 A.L.R.2d 997; Webster's Third New International Dictionary, Unabridged (1961), defines explosion as follows:
"a violent expansion or bursting that is accompanied by noise and is caused by a sudden release of energy from a very rapid chemical reaction, from a nuclear reaction or from an escape of gases or vapors under pressure."
We note the foregoing definition of explosion is generally relied upon by those authorities cited with approval in Levert-St.

*393 John, Inc. v. Birmingham Fire and Casualty Company, above.
Appellant contends the foregoing definition of explosion, which is urged by Insurer and which was employed by the trial court, is a narrow definition of the term. Appellant contends that since explosion is not defined in the policy and because certain types of explosions are expressly excluded from coverage, the policy is ambiguous and uncertain as to the meaning of the word. On this premise, Appellant invokes the rule that ambiguities in an insurance contract are to be construed against the insurer and in favor of the insured. Consequently, Appellant argues, explosion should be interpreted in its broadest sense so as to mean any sudden release or relinquishment of energy causing a break or rupture and accompanied by a loud noise.
Appellant's chief witness and only expert, Dr. Dean C. McKee, Professor of Civil Engineering, Louisiana State University, testified that the cause of the collapse began as a microcrack propagation where the roof joined the west wall. He believed this phenomenon could have been precipitated by the normal contraction of the concrete roof in the drying process and later increased due to interior vibrations in the structure or the sudden failure of internal stresses in the building. He admitted that he found no evidence of any combustion type explosion in the ordinary sense of the term. He stated, however, that when concrete breaks up and disintegrates due to stress, it pops with a loud explosion-like noise, and the release of energy in this fashion may, under some technical scientific theories, be likened to an explosion.
Joseph Guarisco, Inspector for the City-Parish Government, arrived at the scene approximately 15 minutes following the fall of the building. He gave orders for demolition of the north wall. He concluded that the building collapsed due to an explosion set off by an electrical spark or arcing from the control panel situated on the north wall of the building near the stair well. He noted that combustibles were stored in the area near the control panel. He also testified that he saw gasoline cans in this same area, some of which were burst open. Moreover, he noted along the ceiling line of the room containing the control panel, a smudge or burn mark four to six inches wide and several feet in length indicating that combustion had taken place in that area. He admitted that smudge line was the only evidence of combustion seen in this room or any other area of the building. Noting that the reinforcement rods protruding through the ends of the intermediate floor slabs, which had rested on the west wall, were still extending straight out and had been stretched or drawn to pencil points, he considered this evidence of the wall having been blown outward from the intermediate floor before the roof began falling in.
Insurer called four experts all of whom agreed in essence that the structure fell because of a diagonal tension failure of shear failure between the roof system of the two story part of the building and the west wall on which the roof rested.
Harold R. Myers, mechanical engineer associated with an independent and disinterested engineering firm, examined the site commencing about four days after the incident. He spent almost three weeks examining the debris. He especially probed for signs of an explosion and found none save evidence of electrical arcing near the ceiling of the room in which the electrical control panel was situated. He explained that the marks noted were electrical burns which occurred when the building fell and pulled the electrical wires from their connections. He also noted that the presence of gasoline and kerosene fumes in the building after the collapse indicated the absence of an explosion because all such vapors would have been consumed otherwise. He also noted that none of the combustibles in the building showed sign of burning or exposure to heat. He observed further that boxes and materials did not appear scattered throughout the structure as would be expected had there been an explosion.
Myers's views were shared by Edward E. Walters, an employee of the same firm as *394 Myers. Walters, an expert in the field of structural civil engineering concluded that the building fell because of shear failure between the roof and west wall due, at least in part, to the roof's having been made with concrete heavier than that called for in the original plans. In summary, Walters believed that the roof fell in because it lacked the reinforcement necessary to carry its own weight. He found that the ends of the reinforcement rods in the roof slabs did not extend to the ends of the slabs and therefore did not afford support at the point where the slabs rested upon the wall. He noted that the fracture of the slabs occurred at an appropriate 45 angle. He concluded the building collapsed because of design failure, not an explosion.
E. E. Taylor, an associate of Myers and Walters, expert in structural engineering, shared the views of his colleagues. He also explained there was no explosion because material and debris were not thrown any distance from the building and because the second floor windows in the remaining walls were intact following the explosion.
Robert W. McKenzie, expert in the field of structural engineering, unassociated with Myers, Walters and Taylor, in essence testified that the building fell because of poor design failure and haphazard construction. He noted that the original plans called for the second floor to be made of bar joist steel and the roof of lightweight concrete. Instead the roof was made of heavy concrete and the intermediate floor was constructed of the same heavy concrete as the roof without providing for the extra weight involved.
Appellant Schmieder and numerous workmen in the building at the time of collapse testified in effect that they heard a loud noise similar to that resulting from an explosion, following which the building collapsed with a rumbling. None of these witnesses attested to seeing any fire, flame or other evidence of combustion. None of them suffered burns of any nature.
Our research discloses that the dictionaries contain many definitions of the term "explosion". We also note that the case law of other jurisdictions preponderates in favor of the rule that the word "explosion" has no fixed or definite meaning in ordinary speech or in law. Most authorities hold "explosion" is a general term unlimited in application and dependent upon concept of degrees. Its true meaning in a given instance must be determined, not by a fixed criteria or precise measurement, but by the common experiences and notions of ordinary individuals in matters of this nature. Levert-St. John, Inc. v. Birmingham Fire & Casualty Co., above, citing Vorse v. Jersey Plate Glass Insurance Co., 119 Iowa 555, 93 N.W. 569, 60 L.R.A. 838 and Hartford Fire Insurance Co. v. Empire Coal Min. Co., 10 Cir., 30 F.2d 794; American Casualty Company of Reading, Pa. v. Myrick, 5 Cir., 304 F.2d 179; Bower v. Aetna Insurance Co., D.C., 54 F.Supp. 897; Oroville Cordell Fruit Growers, Inc. v. Minneapolis Fire & Marine Insurance Company, 68 Wash.2d 117, 411 P.2d 873; Standard Accident Insurance Co. v. Harrison-Wright Co., 207 N.C. 661, 178 S.E. 235; Transatlantic Fire Insurance Co. of Hamburg v. Dorsey, 56 Md. 70, 40 Am. Rep. 403; United Life, Fire & Marine Insurance Co. v. Foote, 22 Ohio St. 340; Pastour v. Kolb Hardware, Inc., Iowa, 173 N.W.2d 116; Crombie & Co. v. Employers' Fire Insurance Company of Boston, Mass., Tex.Civ.App., 250 S.W.2d 472.
Applying the foregoing rules of construction and interpretation, we find that an explosion did not occur in this instance. We conclude, as did the trial court, that the building fell because of faulty design and construction. We also conclude that the concrete roof fell or caved in onto the intermediate floor due to failure to properly reinforce the roofing and also to failure to furnish adequate wall support for the weight involved. That the roof cracked, because of faulty design, with a loud noise similar to that which accompanies an explosion resulting from the ignition of flammable gases or vapors, or the sudden bursting of a boiler, such an incident would hardly be regarded by an ordinary person as an explosion.
*395 The judgment of the trial court is affirmed at Appellant's cost.
Affirmed.