**STONE CONTAINER CORPORATION, an Illinois Corporation, Plaintiff,**

v.

**HARTFORD STEAM BOILER INSPECTION COMPANY, a Connecticut corporation, Defendant.**

No. 95 C 2953.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 15, 1996.

As Amended Aug. 26, 1996.

Lawrence R. Samuels, Jeffrey Alan Berman, Jacquelyn F. Kidder, Peter James Valeta, Thomas David Titsworth, Ross & Hardies, P.C., Chicago, IL, for plaintiff.

Philip Scott Beck, David Powers Berten, Chicago, IL, Andrew L. Goldman, Bartlit, Beck, Herman Palenchar & Scott, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

On April 13, 1994, a pulp digester at Stone Container Corporation's Panama City, Florida pulp mill failed catastrophically, resulting in the violent release of its contents and causing significant damage to the facility, as well as a substantial interruption to Stone's business at that facility. (This failure is hereinafter referred to as the "Incident.") Three people were killed in the Incident and seven others were injured. At the time of the Incident, Stone was insured under Boiler and Machinery Coverage Policy No. 7710440 (the "Policy") issued by defendant Hartford Steam Boiler Inspection and Insurance Company ("HSB"). HSB declined coverage for the Incident, invoking the Policy's explosion exclusion. The explosion exclusion provides in pertinent part:

We will not pay for ... [l]oss caused by or resulting from ... [a]n explosion. However, we will pay for loss caused by or resulting from an explosion of an "object" of a kind described below and only to "objects" covered by this insurance and as described on an Object Definitions endorsement:

Explosion of any:

(1) Steam boiler;

(2) Electric steam generator;

(3) Steam piping;

(4) Steam turbine;

(5) Steam engine;

(6) Gas turbine; or

(7) Moving or rotating machinery caused by centrifugal force or mechanical breakdown.

Compl., Ex. A, ¶ B.4.a.

In this diversity action, plaintiff Stone Container Corporation ("Stone") seeks declaratory judgment against HSB for coverage of losses resulting from the Panama City Incident. The crux of the parties' dispute lies in whether the failure of the digester constitutes an "explosion" and, if so, whether the explosion is excepted from the general explosion exclusion. The parties' cross motions for summary judgment, pursuant to FED.R.CIV.P. 56, are presently before the Court.

## RELEVANT FACTS

The following recitation of facts is drawn from the parties' Local General Rule 12 statements and exhibits submitted to the Court in connection with the pending motions for summary judgment.[1]

1. Local General Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS LOCAL GENERAL RULE (hereinafter "Local Rule") 12(M)(3). The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." *Id.* Stone's statement in support of its motion for summary judgment shall be cited as "Pl.'s Facts ¶__." HSB's statement in support of its motion shall be cited as "Def.'s Facts ¶__." Additionally, Local Rule 12(N)(3)(a) requires the non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. The parties' responses shall be cited as "Pl.'s Resp. ¶__." and "Def.'s Resp. ¶__," respectively. Local Rule 12(N)(3)(b) authorizes the non-moving party to submit a statement of "additional facts that requires the denial of summary judgment;" pursuant to Local Rule 12(M), the moving party may then submit a reply to the non-moving party's additional facts. The parties' statements of additional facts shall be cited as "Pl.'s Add'l Facts ¶__" and "Def.'s Add'l Facts ¶__," respectively. Similarly, the replies shall be cited as "Pl.'s Resp.Add'l Facts ¶__" and "Def.'s Resp.

## The Parties

Stone is a Delaware corporation with its principal place of business located in Chicago, Illinois. Pl.'s Facts ¶ 1. A major international pulp and paper company engaged principally in the production and sale of paper, packaging products, and market pulp, Stone owns or has an interest in 135 manufacturing facilities in the United States, including a paperboard, paper, and pulp facility located at Panama City, Florida. Pl.'s Facts ¶¶ 1, 2.

HSB is a Connecticut corporation with its principal place of business located in Hartford, Connecticut. Def.'s Facts ¶ 2. HSB is an insurance company that provides Boiler and Machinery and All–Risk insurance to policyholders. Def.'s Facts ¶ 2.

## Stone's Panama City Facility

Stone's Panama City facility is divided into two mills: the pulp mill, which produces wood pulp from wood chips, and the paper mill, which converts pulp into paper. Def.'s Facts ¶ 5. The pulp mill at Panama City houses a series of 22 batch digesters installed side by side in the digester room of the plant. Pl.'s Facts, Ex. C at 1. The batch digesters are used to break down wood chips into pulp fibers that are subsequently processed into paper products. *Id.* The "pulping" process involves filling the digesters with wood chips from an overhead chip bin, then sealing the vessel and adding white and black "liquors" and buffering agents. The mixture is then "cooked" by subjecting it to steam pressure of about 110 to 115 p.s.i. for a period of about two hours, after which a ball valve located at the bottom of the digester is opened, allowing the contents to discharge or "blow" into an unpressurized vessel called a blow tank. Pl.'s Facts ¶ 9; Def.'s Facts ¶ 7.

Add'l Facts ¶ __." All properly supported material facts set forth in either party's statements (*i.e.*, Pl.'s Facts, Def.'s Facts, Pl.'s Add'l Facts, Def.'s Add'l Facts) are deemed admitted unless properly controverted. *See* Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994); *Stewart v. McGinnis.* 5 F.3d 1031 (7th Cir.1993), *cert. denied,* 510 U.S. 1121, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). Moreover, the mere denial of a particular fact

## Pulp Digester # 15

Digester # 15 was built in 1948 by the Chicago Bridge and Iron Works. Def.'s Facts ¶ 10. It stood 36 feet, 6 inches tall, had an inner diameter of 10 feet, 6 inches, weighed over 56,000 pounds, and held about 74 tons of wood chips, chemicals, and steam during the cooking process. Def.'s Facts ¶¶ 9, 10. During the course of its operating life, Digester # 15 underwent many repairs, including a repair in 1983, when the entire internal surface area of the vessel was overlaid with stainless steel. Def.'s Facts ¶ 10. More recently, a two piece repair plate measuring 16 inches high and eleven feet long was welded in the bottom shell course. *See* Pl.'s Facts Ex. C at 4; Def.'s Facts Ex. 22.

Under the terms of Stone's insurance Policy, HSB had the right to perform inspections of Stone's Panama City facility, including the digesters, and did perform inspections of several digesters in the months prior to the Incident.[2] Pl.'s Facts ¶¶ 31, 32; Pl.'s Add'l Facts ¶ 15. The record does not show that HSB inspected Digester # 15 at that time; however, the vessel had been inspected on an annual basis by the mill. Def.'s Facts Ex. 18 at 1. Repair records indicate that the vessel was hydro-tested at 225 p.s.i. ten months before the Incident when a pinhole was repaired. Def.'s Facts Ex. 22.

## The Incident

On April 13, 1994, Pulp Digester # 15 suffered a catastrophic failure. Pl.'s Facts ¶ 10. Major structural and equipment damage ensued, and production at Stone's Panama City facility was interrupted for several months. Pl.'s Facts ¶¶ 10, 11; *see also* Nellis Dep. at 76.

without "specific references to the affidavits, parts of the record, and other supporting materials" is insufficient, and, where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted. *Flaherty,* 31 F.3d at 453.

2. HSB's W.F. "Bill" Bonnett performed inspections of Digesters 1 and 13 during January and February of 1994 and inspected Digester # 4 during March of 1994. Pl.'s Facts ¶¶ 32–35.

The parties have stipulated to the following facts. *See* Def.'s Mem.Opp.Pl.'s Motion to Strike, Ex. 1, Stipulation ¶ 8. Digester # 15 failed catastrophically at approximately 3:37 p.m. on April 13, 1994, precipitating the following events: The upper portion of Digester # 15 broke out the concrete floor slab of the fourth level of the pulp mill, struck the metal shell of the catenary-shaped chip bin, flew through the west side of the pulp mill building roof, struck the brick masonry of the parapet/west wall of the pulp mill building, struck a cable tray installed just west of the paper mill building roof ridge, flew over to the west edge of the paper mill building roof, fell through the paper mill building roof, broke out a portion of the overhead bridge crane rail along the paper mill building west wall, and came to rest inside the paper mill building, against the west wall, nozzle (upper) end pointed east, lying on top of piping above five pulp refiners installed north of the Number 1 paper machine. Stipulation ¶ 8; *see also* Pl.'s Facts Ex. C at 3–4. When the upper portion of Digester # 15 struck the chip bin, the bin shell was split open and a large quantity of chips was dumped into the building interior. Stip. ¶ 8. When the floor slab of the fourth level of the pulp mill broke out, the entire north central room fell to the first level. *Id.* Five pulp screens in a row of the screen-level floor (west of the row of the digesters) were destroyed. *Id.* Various debris fell on the pulp washers, breaking the fiberglass hoods and vent pipes. *Id.* Debris fell through the roof of the paper mill building on its east side. *Id.* The failure of Digester # 15 caused many of the building's primary structural elements around the Number 15 digester location to be damaged and caused other major damage inside the pulp mill building.[3] *Id.* As a result of the failure of digester # 15, steam pipes were ruptured and electrical power and control cabling was torn loose in and around the location of Digester # 15. *Id.* The steam plant and electrical generating station under-

went a very rapid shutdown, bringing down the entire paper mill plant. *Id.*

There were no reports of any unusual events prior to the Incident.[4] *See* Pl.'s Facts Ex. C at 11; *see also* Def.'s Facts Ex. 4 at 5–8. The failure of Digester # 15 was not caused by any event or occurrence external to the vessel or its contents at that time, nor was the failure caused by any form of ignition or combustion. Pl.'s Facts ¶¶ 41–43.

Stone retained Packer Engineering ("Packer") to perform an independent investigation and analysis of the cause of the Incident in cooperation with the Occupational Safety and Health Administration (OSHA) and OSHA's representative, Law Engineering Industrial Services. Pl.'s Facts ¶ 19; Pl.'s Ex. C at 1. Packer concluded that the rupture of the digester originated at an axial (longitudinal) fracture in the lower shell plate. Pl.'s Facts ¶ 25. Axial fractures are propagated by hoop stresses brought about by internal pressurization of the vessel. *Id.* There were significant reductions in the shell plate thickness identified at various areas, and the thinning of the shell plate occurred prior to the application of the weld overlay. Packer did not, however, investigate the exact cause and mechanism of the shell plate thinning. *Id.* The digester shell plate thickness was significantly reduced at the fracture area where the rupture initiated. *Id.* In addition, a considerable amount of pre-existing cracking had breached the overlay thickness in the initiating area of the vessel rupture. *Id.* The digester shell plate at the fracture initiation site was well below the minimum wall thickness as determined by ASME, Section VIII, Division 1 of the Boiler and Pressure Vessel Code. *Id.* Additionally, Packer concluded that the weld overlay, if intact, would reinforce the strength of the shell plate, however, with the presence of the pre-existing cracks in the welds, reinforcement would be seriously impaired. *Id.* Packer Engineering's investigation did not indicate a situation which would have caused the digester to be pressurized above normal

---

3. The release of pressure caused digesters # 14 and # 16 to topple toward the original location of Digester # 15. Pl.'s Facts Ex. C at 4.

4. In statements made two days after the Incident, several Stone employees working in the

Digester room on April 13, 1994 stated that preceding the Incident, everything was running normally in the Pulp Mill. Def.'s Facts Ex. 4 at 5–8.

operating levels of approximately 150 p.s.i., and measurements of the vessel did not indicate any overall bulging or barreling of the vessel prior to rupture. Pl.'s Facts Ex. C at 11.

Stone, Law Engineering, and Packer agreed that the failure of Digester # 15 originated in an area in the vessel wall that was 20 inches high by 9 inches wide. Def.'s Facts ¶ 21. At the fracture plane, the thickness of the carbon steel averaged about 0.18 inches with one area down to 0.11 inches. *Id.* The overall wall thickness of the combined carbon and stainless steel overlay averaged 0.42 inches with 35% of the stainless steel overlay containing preexisting cracks. *Id.* In some areas, the cracking extended through the stainless steel to the underlying carbon steel. *Id.* The minimum wall thickness required by the ASME Boiler and Pressure Vessel code for this particular vessel is 0.585 inches. Def.'s Facts ¶ 22. *See also* Def.'s Facts Ex. 24, 18.

At the time of the Incident, Digester # 15 was being operated in the normal course of business to break down wood chips into pulp fibers. Pl.'s Facts ¶¶ 28, 29. The vessel was fully loaded, containing approximately 74 tons of material with a total volume of approximately 2,590 cubic feet. Def.'s Facts ¶ 23. The total volume occupied by the contents when released from the pressurized vessel expands to approximately 426,300 cubic feet. Def.'s Facts ¶ 24. The total energy released by the failure of Digester # 15 was at least 14,300,000 BTUs. Def.'s Facts ¶ 25. If released over a period of ten seconds, this is the equivalent of 2.0 million mechanical horsepower. *Id.*

### The Insurance Policy

Effective January 1, 1994, HSB issued Boiler and Machinery Coverage Policy No. 7710440 ("Policy") which covered, *inter alia*, Stone's Panama City facility. Pl.'s Facts ¶ 5. Prior to issuing the Policy, an HSB employee surveyed Stone's facility to assess the risk involved in insuring the mill. Pl.'s Add'l Facts ¶¶ 9–12; Pl.'s Facts Ex. F. HSB knew that Stone's operations at Panama City involved the use of batch digesters and that HSB would be providing insurance for some accidents to those vessels. Pl.'s Add'l Facts ¶¶ 7, 9–12; Def.'s Resp. Add'l Facts ¶¶ 7–12; Pl.'s Facts Ex. F.

The HSB Policy provides: "[w]e will pay for direct damage to Covered Property caused by a Covered Cause of Loss." Complaint Ex. A at 1. The Policy defines "Covered Property" as any property that the insured owns or that is in its care, custody or control and for which it is legally liable. *Id.* Under the Policy's definitions, Pulp Digester # 15, along with other machinery and equipment located at Stone's Panama City facility constitute "Covered Property." Pl.'s Facts ¶ 16. HSB defines a "Covered Cause of Loss" as an "'accident' to an 'object' shown in the Declarations." Complaint Ex. A at 1. Object Definition No. 6, an endorsement to the HSB policy, provides that "object" means any: boiler, fired vessel, and unfired vessel normally subject to vacuum or internal pressure other than weight of its contents. Def.'s Resp. Ex. 35. Digester # 15 was an "object" in use at the time of the Incident as defined by the Policy. Pl.'s Facts ¶ 17. The term "accident" is defined as "a sudden and accidental breakdown of the 'object' or a part of the 'object.'" Complaint Ex. A at 5. The breakdown must manifest itself by physical damage to the "object" that necessitates repair or replacement at the time it occurs. *Id.*

The issue in this action is whether the Panama City Incident was a covered accident under the terms of the Policy. HSB's policy excludes payment for losses "caused by or resulting from" explosions, amongst other things. *See* Complaint Ex. A at 2. The pertinent part of the exclusion provision reads as follows:

**EXCLUSIONS**

We will not pay for . . . Loss caused by or resulting from:

a. An explosion. However, we will pay for loss caused by or resulting from an explosion of an "object" of a kind described below and only to "objects" covered by this insurance and as described on an Object Definitions endorsement:

Explosion of any:

(1) Steam boiler;

(2) Electric steam generator;

(3) Steam piping;

(4) Steam turbine;

(5) Steam engine;

(6) Gas turbine; or

(7) Moving or rotating machinery caused by centrifugal force or mechanical breakdown;

b. Fire or explosion that occurs at the same time as an "accident" or that ensues from an "accident".

(Complaint, Ex. A.)

Following the Incident, pursuant to Policy terms, Stone notified HSB regarding the failure of Digester # 15. Pl.'s Facts ¶ 12. *See also* Complaint Ex. A. HSB advised Stone that it was declining all coverage for the Panama City Incident under the Policy in a letter dated May 26, 1994. Pl.'s Facts ¶ 13. On December 19, 1994, Stone, by its counsel, sent HSB a letter seeking further explanation regarding HSB's refusal of coverage. Complaint Ex. C. HSB responded by letter dated February 27, 1995, advising Stone that it continued to decline all coverage under the Policy for the Incident. Complaint Ex. D. In that letter, HSB explained that it was denying Stone's claim because the failure of Digester # 15 was an "explosion" excluded from coverage under paragraph B.4.a. of the Policy. *Id.* HSB further stated that paragraph B.4.b. of the Policy, which precludes coverage for loss caused by an "explosion that occurs at the same time as an 'accident,' or that ensues from an 'accident,'" could negatively affect coverage. *Id.*

Subsequently, Stone filed a complaint seeking declaratory judgment that HSB's policy covered the losses sustained by Stone as a result of the Incident.

## ANALYSIS

### Summary Judgment Standards

■ Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, and draw all reasonable inferences from the evidence in the nonmovant's favor. *Cincinnati Ins.,* 40 F.3d at 150. However, if the evidence is merely colorable, or is not significantly probative, or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 261, 106 S.Ct. at 2516; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

■ Where cross motions for summary judgment have been submitted, the court is not required to grant judgment as a matter of law for one side or the other. *Heublein, Inc. v. U.S.,* 996 F.2d 1455, 1461 (2d Cir. 1993). The court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Id.; Buttitta v. City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd,* 9 F.3d 1198 (7th Cir.1993).

### Policy Construction

Resolution of this action requires the Court to interpret the terms of Stone's Boiler and Machinery Policy. The interpretation of an insurance policy, like any other contract, is a question of law. *Employers Ins. of Wausau v. Bodi–Wachs Aviation Ins. Agency, Inc.,* 39 F.3d 138, 141 (7th Cir.1994). The legal principles governing the construction of

an insurance policy under Illinois law[5] are well established. The court's primary objective "is to ascertain and enforce the intentions of the parties as expressed in the agreement." *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill.2d 384, 391, 189 Ill.Dec. 756, 761, 620 N.E.2d 1073, 1078 (1993); *see also Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 108, 180 Ill.Dec. 691, 699, 607 N.E.2d 1204, 1212 (1992); *Playboy Enters., Inc. v. St. Paul Fire & Marine Ins. Co.*, 769 F.2d 425, 427–28 (7th Cir.1985). "To ascertain the intent of the parties and the meaning of the words used in the insurance policy, the court must construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract." *Crum & Forster*, 156 Ill.2d at 391, 189 Ill.Dec. at 761, 620 N.E.2d at 1078; *see also Outboard Marine*, 154 Ill.2d at 108, 180 Ill.Dec. at 699, 607 N.E.2d at 1212. Where the words of the policy are plain and unambiguous, the court must afford them their plain, ordinary, and popular meaning and apply them as written. *Crum & Forster*, 156 Ill.2d at 391, 189 Ill.Dec. at 761, 620 N.E.2d at 1078; *Outboard Marine*, 154 Ill.2d at 108, 180 Ill.Dec. at 699, 607 N.E.2d at 1212. On the other hand, "if the words in the policy are susceptible to more than one reasonable interpretation, they are ambiguous ... and will be construed in favor of the insured and against the insurer who drafted the policy." *Outboard Marine*, 154 Ill.2d at 108–09, 180 Ill.Dec. at 699, 607 N.E.2d at 1212.

▇▇▇ Two provisions of Stone's Policy require interpretation in this case. The first is the Policy's general explosion exclusion; the second is the Policy's exceptions to the explosion exclusion.[6] We address these provisions in turn below.

---

5. In briefing their respective summary judgment motions, both parties have relied principally on Illinois law for the rules governing insurance policy interpretation. *See* Stone's Mem.Supp. Summ J. at 4; HSB's Mem.Supp.Summ.J. at 8–9. Also, in its response to Stone's supporting memorandum, HSB advanced the view that because Illinois law did not differ from the law of other potentially interested states, no true conflict exists and therefore this Court should apply the law of the forum state (Illinois). Stone did not contest this assertion in any way; to the contrary, in its reply Stone continued to press its interpretation of Illinois law. Stone's Reply Supp.Summ.J. at 3. Accordingly, we conclude that the parties have stipulated to the application of Illinois law to this action. As the Seventh Circuit has observed, "the parties to a lawsuit can, within broad limits, stipulate to the law governing their dispute; the parties have impliedly stipulated to the application of Illinois law, and an implied stipulation is good enough." *Cates v. Morgan Portable Bldg. Corp.*, 780 F.2d 683, 687 (7th Cir.1985); *Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183 (7th Cir.1993) ("Litigants are free to stipulate to the application of a particular state's law, so we accept their agreement that Illinois law applies"); *see also Employers Ins. of Wausau v. Bodi–Wachs Aviation Ins. Agency, Inc.*, 39 F.3d 138, 141 n. 2 (7th Cir.1994) (applying Illinois law where the parties argued Illinois law in their submissions and no choice of law issue was raised). We further note that under *Kritikos v. Palmer Johnson, Inc.*, 821 F.2d 418, 421 (7th Cir.1987), " '[w]hen the parties fail to consider the choice of law in a diversity case, the substantive law of the forum is presumed to control,' " (quoting *Baltimore Orioles v.*

*Major League Baseball Players*, 805 F.2d 663, 681 n. 33 (7th Cir.1986)). Accordingly, we apply Illinois law to this diversity case.

6. Stone argued in its memorandum in support of summary judgment that the catastrophic failure of Pulp Digester # 15 was an "accident" as defined by the policy. *See* Stone's Mem.Supp.Mot. Summ.J. at 5–8. In its response, HSB does not address this point, let alone join issue on the matter. However, after Stone concluded in its reply memorandum that HSB had conceded the "accident" issue, HSB surreplied that it "has made no such concession. Rather, HSB has followed this Court's direct instruction to brief the 'explosion issue.' For purposes of summary judgment on the explosion issue, HSB does not dispute that an 'accident' occurred. Should HSB's motion be denied, HSB reserves the right to challenge whether an 'accident' in fact took place." HSB Surreply at 4–5. HSB is patently misrepresenting the record in this case when it refers to "this Court's direct instruction to brief the 'explosion issue.' " In a hearing held in open Court on March 3, 1996, in the presence of counsel for both parties, the following exchange between Stone's counsel and the Court took place:

> Mr. Berman: I just want to understand what I'm supposed to brief.
>
> . . . . .
>
> Mr. Berman: Only the explosion ambiguity or all ambiguity issues? That's what I'm trying to understand.
>
> The Court: You can brief all ambiguity issues. And, listen, you can brief whatever you want

## 1. Explosion Exclusion

In pertinent part, the Policy's Exclusion provisions state: "We will not pay for ... [l]oss caused by or resulting from ... [a]n explosion." Compl., Ex. A. Stone maintains that the term "explosion" is ambiguous and that under the rule of *contra proferentem* (ambiguous terms should be construed against the insurer who drafted them), this Court should afford that term a meaning that results in coverage. More specifically, Stone argues that the term explosion is ambiguous because it is not defined in the policy and is susceptible to more than one reasonable meaning. We note parenthetically that Stone does not explicitly contend that the Panama City incident was not an explosion.

█ Before addressing Stone's specific contentions, we pause to set out some additional detail regarding how Illinois courts go about the task of interpreting insurance policies, with particular focus on the ambiguity problem. In this regard, the Illinois Su-

---

to brief and I will decide what parts are relevant or not. [A]t this point I'm restricting the further briefing to issues involving ambiguity....

Transcript of March 3, 1996. It cannot be disputed that Stone put the interpretation of the term "accident" squarely into issue as part of its motion and did so, at least in part, arguing that the term "accident" is ambiguous. *See* Stone's Mot.Summ.J. ¶¶ 9, 10; Stone's Mem.Supp.Mot.Summ.J. at 5–8 & n. 4. HSB's counsel made no effort to determine whether the "accident" issue raised by Stone in its motion and supporting memorandum constituted an ambiguity issue; indeed, the "accident" issue was never even mentioned, let alone mentioned as a source of uncertainty at the March 3 hearing. Then, rather than addressing the issue, HSB simply disregarded Stone's arguments and now attempts to create a "heads we win, tails you can't win" situation. This Court cannot and will not sanction this approach. In the first place, the Court cannot find any record of having directed the parties to restrict their briefing to the "explosion issue." As the above-quoted excerpt plainly indicates, the Court advised the parties that they could brief whatever issues they wanted to brief; and, while the Court did state that it was restricting further briefing to issues involving ambiguity, the Court expressly noted that there may be differences in how broadly the parties define ambiguity. Stone clearly identified the "accident" issue as one involving ambiguity. Stone's Mem.Supp.Mot.Summ.J. at 6 n. 4. ("[T]he Policy's use of the term 'accidental' to define 'accident' is less than illuminating as to the separate meaning the term 'accident' is to be given. As such, it is ambiguous, and should be construed in favor of Stone as the insured.") Under these circumstances, HSB's decision to ignore Stone's arguments as to whether the Panama City Incident was a covered "accident," was a strategic litigation choice made at its own peril.

On the present record, there is no genuine issue of material fact as to whether an "accident" occurred in Panama City. The policy defines an accident as "a sudden and accidental breakdown of the 'object' or a part of the 'object' ... [that manifests] itself by physical damage to the 'object' that necessitates repair or replacement." Policy ¶ F(1). Here, there is no dispute that the Panama City Incident was a sudden and accidental breakdown that manifested itself in physical damage to Digester # 15. Furthermore, although the policy's definition of "accident" excludes "[d]epletion, deterioration, corrosion, or erosion," it does not follow that a breakdown caused by such deterioration, corrosion or erosion (such as the thinning of the digester wall) is not an accident. Indeed, the uncontroverted evidence in the record indicates that it is a covered accident. As HSB's underwriting training manual explains:

**Covered Accidents**
An "**accident**" is defined ... to mean a sudden and accidental breakdown of an object ... that causes physical damage to the object necessitating its repair or replacement. Although wear and tear per se is excluded, if wear and tear causes an "object" to break down, such a loss is covered, provided that the breakdown itself is sudden and that the "object" requires repair as a result (as opposed to simply the replacement of a worn part discovered during routine maintenance).

**Wear and Tear**
... [A] key in determining whether a covered "accident" has occurred can be found in the phrases "sudden and accidental" and which manifests itself ... by physical damage to the "object" in the definition of "accident" quoted above.

⋅ ⋅ ⋅ ⋅ ⋅

Breakdown that may have ultimately been caused by wear and tear and the passage of time, but which occurs suddenly and damages part of an "object" other than the worn part ... probably will be covered. For instance, if a single blade of a fan suddenly breaks off, bending the rest of the fan blades, even though the breakage may be the result of wear and tear, a covered "accident" has occurred.

Stone's Reply Supp.Mot.Summ.J., Ex. A. *See Pioneer Chlor Alkali Co. v. Royal Indem. Co.,* 879 S.W.2d 920, 937–38 (Tex.App.1994) (interpreting a similar provision to apply to a sudden failure of a boiler due to corrosion). Accordingly, the Court finds no genuine issue of material fact as to whether the Panama City Incident was an "accident" under the terms of the policy, and we proceed to consider the interpretation of the disputed provisions of the policy.

preme Court has cautioned that, "[i]n applying the rules of interpretation, the words of the policy should be given their plain and ordinary meaning and the court should not search for ambiguity where there is none." *United States Fire Ins. Co. v. Schnackenberg,* 88 Ill.2d 1, 5, 57 Ill.Dec. 840, 842, 429 N.E.2d 1203, 1205 (1981). More recently, the Court admonished that "a court cannot read an ambiguity into a policy just to find in favor of the insured." *Lapham–Hickey Steel Corp. v. Protection Mut. Ins. Co.,* 166 Ill.2d 520, 530, 211 Ill.Dec. 459, 463, 655 N.E.2d 842, 846 (1995). And, applying Illinois law, the Seventh Circuit has echoed this sentiment, noting that "the court must not create an ambiguity where none exists; a clear and unambiguous provision must be applied as written." *Hurst–Rosche Eng'rs, Inc. v. Commercial Union Ins. Co.,* 51 F.3d 1336, 1342 (7th Cir.1995). A policy provision is ambiguous only if it is subject to more than one reasonable interpretation, *Lapham–Hickey,* 166 Ill.2d at 530, 211 Ill.Dec. at 463, 655 N.E.2d at 846; and, as the Illinois Supreme Court emphasized in *Bruder v. Country Mut. Ins. Co.,* 156 Ill.2d 179, 193, 189 Ill.Dec. 387, 394, 620 N.E.2d 355, 362 (1993), "Reasonableness is the key." With these standards in mind, we now turn to Stone's arguments.

■ First, Stone suggests that the term "explosion" is ambiguous because it is not defined in the policy: "There is ... no express definition of 'explosion' in the Policy ... [u]se of the term 'explosion' ... therefore, introduces an ambiguity which must be construed in favor of Stone." Stone's Mem. Supp.Summ.J. at 9–10. Illinois law is quite clear, however, that "[a] policy term is not ambiguous because the term is not defined within the policy or because the parties can suggest creative possibilities for its meaning." *Lapham–Hickey,* 166 Ill.2d at 529, 211 Ill.Dec. at 463, 655 N.E.2d at 846.

Thus, in *Outboard Marine Corp. v. Liberty Mutual Ins. Co.,* 154 Ill.2d 90, 115, 180 Ill. Dec. 691, 703, 607 N.E.2d 1204, 1216 (1992), the Illinois Supreme Court stated that where

a term is not defined in the policy, "we must interpret [it] by affording it its plain, ordinary, and popular meaning." Accordingly, rather than finding the term "damages" to be ambiguous simply because the term was undefined in the policy (and, we might add, despite the fact that state and federal courts across the country have reached conflicting decisions as to the meaning of the term "damages"), the *Outboard Marine* court proceeded to apply the plain and ordinary meaning of the term and found it unambiguous. Thus, while the lack of a definition of "explosion" may be relevant to the question of whether the term is ambiguous, the absence of a definition, standing alone, does not compel a conclusion that the term is ambiguous. It is really little more than the point of departure for a more searching inquiry.

■ We turn now to Stone's more apposite argument—*viz.,* that the term "explosion" can reasonably be read to have more than one meaning, and hence must be construed in Stone's favor. In support of its argument, Stone cites to *Schmieder v. State Farm Fire & Casualty Co.,* 339 So.2d 390 (La.Ct.App. 1976), for the proposition that the term "explosion" admits of no uniform definition.[7] Indeed, the *Schmieder* court noted:

> Our research discloses that the dictionaries contain many definitions of the term "explosion." We also note that the case law of other jurisdictions preponderates in favor of the rule that the word "explosion" has no fixed or definite meaning in ordinary speech or in law. Most authorities hold "explosion" is a general term unlimited in application and dependent upon concept of degrees. Its true meaning in a given instance must be determined, not by fixed criteria or precise measurement, but by the common experiences and notions of ordinary individuals in matters of this nature.

*Id.* at 394.

Notwithstanding the foregoing observations, the *Schmieder* court did not deem the term "explosion" to be ambiguous and, ac-

---

7. The policy at issue in *Schmieder* provided coverage for loss resulting from, among other things, "explosion."

cordingly, rejected an insured's entreaty to construe the term broadly so as to encompass the collapse of a concrete roof which resulted from faulty design and construction. Rather, employing principles of policy construction materially identical to those of Illinois,[8] the court interpreted and applied the term "in its ordinary sense as used and understood by laymen rather than technicians and scientists." 339 So.2d at 392. "The words employed in an insurance policy are to be understood in their common and usual significance without attending so much to grammatical rules as general and popular use." *Id.* In this effort, the *Schmieder* court relied on a dictionary definition of explosion—"a violent expansion or bursting that is accompanied by noise and is caused by a sudden release of energy from a very rapid chemical reaction, from a nuclear reaction or from an escape of gases or vapors under pressure," *id.* (quoting Webster's Third New Int'l Dictionary Unabridged (1961)), and concluded that the collapse of the cement roof was not an explosion under the terms of the policy.

■ Thus, Stone's reliance on *Schmieder* is quite misplaced except to the extent that Stone relies on this case for the proposition that the term "explosion" has no fixed or definite meaning—a simple proposition that our own court of appeals has recognized. *Pre–Cast Concrete Prods., Inc. v. Home Ins. Co.,* 417 F.2d 1323, 1329 n. 6 (7th Cir.1969)

(noting, "the cases admit that 'explosion' is a term insusceptible of fixed definition") (internal quotation marks omitted). However, from the fact that "explosion" is insusceptible of fixed definition, it does not necessarily follow that the term does not have a plain and ordinary meaning.[9] To the contrary, in both *Schmieder* and *Pre–Cast* (discussed below), the courts had little or no difficulty ascertaining and applying the plain meaning of "explosion." Furthermore, it does not necessarily follow that every proposed meaning offered by a party arguing ambiguity is reasonable in any given context.

In the instant case, this Court, like the *Schmieder* court, must construe the term explosion, and we begin that process by examining the term's plain, ordinary and popular meaning. Fortunately, this issue has already been thoroughly examined by the Seventh Circuit in *Pre–Cast Concrete Prods., Inc. v. Home Ins. Co.,* 417 F.2d 1323 (7th Cir.1969). In *Pre–Cast,* an autoclave used for the curing of concrete blocks ruptured, and the court was called upon to determine whether that rupture was a covered "loss by explosion." The autoclave was an 8 by 22 foot cylindrical pressure vessel, designed to build up internal steam pressure up to 150 lbs./psi. At the time that the autoclave ruptured, its safety valve was set at 142 lbs./psi. and the internal pressure was at 124 lbs./psi. When the autoclave rup-

8. In *Canadian Radium & Uranium Corp. v. Indemnity Ins. Co.,* 411 Ill. 325, 332, 104 N.E.2d 250, 254 (1952), the Illinois Supreme Court stated the rule of construction of insurance contracts as follows: "The construction to be given insurance contracts, like other contracts, should be a natural and reasonable one.... If the language is clear, the terms are to be taken and understood according to their plain, ordinary and popular sense." *See also Outboard Marine Corp. v. Liberty Mutual Ins. Co.,* 154 Ill.2d 90, 115, 180 Ill.Dec. 691, 703, 607 N.E.2d 1204, 1216 (1992) (stating that where a term is not defined in the policy "we must interpret [it] by affording it its plain, ordinary, and popular meaning."); *Economy Preferred Ins. Co. v. Grandadam,* 275 Ill. App.3d 866, 872, 212 Ill.Dec. 190, 194, 656 N.E.2d 787, 791 (3d Dist.1995) ("[I]n Illinois, the rule is that the courts will give words in a policy their plain and ordinary meaning and will not search for ambiguity where there is none."); *Coley v. State Farm Mutual Auto. Ins. Co.,* 178 Ill.App.3d 1077, 1081, 128 Ill.Dec. 200, 202, 534

N.E.2d 220, 222 (3d Dist.1989) ("[U]nless it is obvious that the language in a policy is used in a technical connotation, the language is accorded the meaning which common experience imparts."). *Cf. Lever Bros. Co. v. Atlas Assur. Co.,* 131 F.2d 770, 775 (7th Cir.1942) ("We are dealing with the word 'explosion' in the way in which it is commonly accepted and understood. The insurance companies will not be heard to say that they meant by 'explosion' anything more than the common understanding of the term.") (applying Indiana law).

9. The following remarks by the Seventh Circuit are particularly apposite here: "The existence of multiple dictionary definitions does not compel the conclusion that a term is ambiguous.... Nor does the presence of profound judicial disagreement over the interpretation of [a term] make it ambiguous." *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 152 (7th Cir.1994).

tured, its spherical door was propelled several hundred feet by the steam pressure that was suddenly released and the autoclave itself was propelled approximately 100 feet by the remaining force of steam pressure. The insured's policy provided coverage for loss by explosion (except for certain exclusions not relevant here); however, the defendant insurer denied coverage, contending that the occurrence was not an "explosion."

Relying principally on two cases involving the rupture of containers—one a grain elevator, the other a steel tank containing soy bean oil—which had suggested that a sudden increase in internal pressure was a necessary element in defining "explosion," the insurer argued that "without a 'sudden increase' in pressure within the autoclave, no explosion occurred." *Pre–Cast,* 417 F.2d at 1326–28. The district court granted summary judgment in favor of the insurer, finding that the cause of the rupture of the autoclave was not a sudden build up of pressure and thus the event was not an explosion. *Id.* at 1325. The Seventh Circuit reversed, finding that the autoclave exploded. *Id.,* at 1328, 1329.

In reaching its holding, the Court began by considering dictionary definitions of the word "explosion." The court noted the following definitions of explosion: (1) "a violent bursting or expansion with noise, following the sudden production of great pressure, as in the case of explosives, or a sudden release of pressure as in the destruction of a steam boiler," Webster's New Int'l Dictionary Unabridged (2d ed. 1954); (2) "a violent expansion or bursting with noise, as of gunpowder or a boiler (opposed to implosion)," Random House Dictionary of the English Language, Unabridged (1967); (3) "a violent expansion or bursting that is accompanied by noise and is caused by a sudden release of energy from a very rapid chemical reaction, from a nuclear reaction or from an escape of gases or vapor under pressure (as in a steam boiler)," Webster's Third New Int'l Dictionary (1966). *Pre–Cast,* 417 F.2d at 1326. Summarizing these definitions, the court stated:

Thus, as defined in the dictionary, an explosion includes an occurrence where a great and expanding pressure is suddenly released. It is the violent expansion itself which constitutes the explosion, and none of the above authorities limit the occurrence of such expansion to the inside of a container. Thus, ... the internal pressure of a boiler, if suddenly released by a defective enclosure, would cause an explosion— "an escape of ... vapor under pressure" (Webster's Third Edition, supra)—whether or not such pressure was built up slowly or rapidly.

*Id.* at 1326.

The court then reviewed the two cases [10] relied on by the defendant insurer for the proposition that an "explosion" necessarily involves "a sudden increase in internal pressure" and, finding those cases distinguishable on their facts, the court found no support for that general proposition in either of the cases, stating: "In none of the cases cited by defendant do we find a requirement that in all cases of an explosion there must be a sudden increase in internal pressure. Rather, if one criterion can be found, it is 'sudden expansion of a substance.'" *Id.* at 1328 (citation omitted).

The court commented on the defendant's proposed construction of the term "explosion," implicitly recognizing its unreasonableness as follows:

Defendant's argument would seem to exclude the explosion of a steam boiler unless there was a *sudden* increase in internal pressure. The difference between the violent bursting of a steam boiler which is suddenly heated and one which gradually builds up an abnormal amount of pressure is beyond our comprehension. Had the autoclave in the instant case slowly built up pressure in excess of its maximum 150 lbs. psi, resulting in a violent rupture, could defendant plausibly argue that no explosion occurred since the excessive pressure had not developed suddenly?

*Id.* Finally, the court concluded:

[I]n circumstances involving a container, an explosion occurs when the pressure in-

---

**10.** The cases are *Hulcher Soya Prods. v. Millers' Mut. Fire Ins. Ass'n,* 5 Ill.App.2d 235, 124 N.E.2d 570 (3d Dist.1955) (abstract opinion) and *Honey-* mead Prods. Co. v. Aetna Cas. & Sur. Co., 275 Minn. 182, 146 N.W.2d 522 (1966).

side the container exceeds the strength of the container and results in a sudden release of the pressure. This may happen either when a higher than normal internal pressure exceeds the natural breaking point of the container, or where there is a decrease in the natural breaking point of the container operating under normal internal pressure.

*Id.* Applying this definition of explosion, the court had no difficulty finding that the rupture of the autoclave was an explosion under the terms of the policy at issue. *Id.* 1329 ("Thus, it was the sudden and violent expansion of a substance—steam, upon its sudden release—which was the explosion in the instant case."); *id.* at 1328 ("It is the violent expansion of the steam which was suddenly released in the instant case which constituted the explosion.").

In like fashion, this Court finds that the term "explosion" as used in the Policy admits of a plain and ordinary construction based on common experience, which, as summarized by the *Pre-Cast* court, includes an occurrence involving the sudden and violent release of expanding pressure. 417 F.2d at 1326, 1329. Thus, although the term is a general one, encompassing occurrences of myriad causes and varying degrees of violence, we do not find it to be ambiguous. We specifically reject Stone's suggested con-

structions of the term—limiting it to occurrences involving combustion or a sudden increase in internal pressure—as unreasonably technical and narrow. Indeed, we find such limiting constructions to be expressly foreclosed by the Seventh Circuit's analysis in *Pre-Cast.*[11]

█ Finally, following *Pre-Cast,* there can be no genuine dispute that the violent rupture of Digester # 15 was an "explosion" under the terms of the Policy. The rupture of Digester # 15 occurred because thinning and cracking of its shell wall reduced its natural breaking point so that it could not withstand normal operating pressure, resulting in the violent release of its contents. Here, as in *Pre-Cast,* the contents of the vessel were under pressure, and as the Seventh Circuit explained, "it is the internal pressure of compressed steam which causes it, when suddenly released, to violently expand—to explode." 417 F.2d at 1328.

Having determined that the term "explosion" as used in the policy is not ambiguous and that the violent rupture of Digester # 15 constituted an "explosion," we must conclude that the explosion of Digester # 15 is excluded from coverage unless it is excepted from the explosion exclusion under one or more of

11. We are mindful of the fact that, after determining that the rupture of the autoclave was an "explosion" as that term is commonly understood, the *Pre-Cast* court went on to reject the defendant insurer's argument that the term "explosion" was unambiguous and that the rule of *contra proferentem* was inapplicable. Thus, Stone has some basis for citing *Pre-Cast* as support for its position that the term "explosion" is ambiguous. However, we do not believe that *Pre-Cast* can support such a construction under the facts of this case. In the first place, in finding an ambiguity, the *Pre-Cast* court placed emphasis on the two facts that the term "explosion" was not defined in the policy and that vigorous contention existed over the meaning of that term. *See Pre-Cast,* 417 F.2d at 1329. However, more recently the Supreme Court of Illinois has cautioned that a term is not ambiguous merely because it is undefined in the policy, *Lapham–Hickey,* 166 Ill.2d at 529, 211 Ill.Dec. at 463, 655 N.E.2d at 846; and, the Seventh Circuit has itself noted that neither multiple dictionary definitions nor profound judicial disagreement over the meaning of a term render it ambiguous, *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv.,*

*Inc.,* 40 F.3d 146, 152 (7th Cir.1994). The existence of ambiguity depends on the existence of more than one reasonable meaning for the subject term—which brings us to our next point. It must be borne in mind that the defendant insurer in *Pre-Cast* had contended that the term "explosion" was limited to occurrences involving a sudden increase in internal pressure. It was against this backdrop that the court found an ambiguity, presumably based on the existence of a reasonable alternative meaning. In the instant case, Stone suggests alternative meanings for the term "explosion" which simply cannot be considered reasonable in the wake of *Pre-Cast;* indeed, at least one of those meanings (sudden increase in internal pressure) is the very one offered by the defendant in *Pre-Cast* and rejected by that court. As the Illinois Supreme Court noted in *Bruder,* 156 Ill.2d at 193, 189 Ill.Dec. at 395, 620 N.E.2d at 362, the reasonableness of the proposed alternative meanings is "key." Such reasonableness is absent here. Accordingly, we do not find *Pre-Cast* to be controlling authority for the proposition that the term "explosion" is *per se* ambiguous.

the exclusion exceptions, which we now consider.

### 2. *Explosion Exclusion Exceptions*

As previously noted, the Policy's Exclusion provisions state: "We will not pay for . . . [l]oss caused by or resulting from . . . [a]n explosion." Compl., Ex. A, ¶ B.4.a. They continue with the following exceptions:

> However, we will pay for loss caused by or resulting from an explosion of an "object" of a kind described below and only to "objects" covered by this insurance and as described on an Object Definitions endorsement:
>
> Explosion of any:
>
> (1) Steam boiler;
>
> (2) Electric steam generator;
>
> (3) Steam piping;
>
> (4) Steam turbine;
>
> (5) Steam engine;
>
> (6) Gas turbine; or
>
> (7) Moving or rotating machinery caused by centrifugal force or mechanical breakdown.

*Id.*

Stone contends on several grounds that the foregoing language is ambiguous and must be construed in its favor so as to result in coverage for the explosion of Digester # 15. First, Stone argues generally that the exclusion provisions are "structurally" ambiguous. Specifically, Stone contends that the format by which the policy sets out coverage, exclusions and exceptions is confusing and convoluted and therefore ambiguous:

The Policy provides that "accidents" to "objects" are covered, but in another part of the Policy excludes "explosions" of "objects." Yet, in the next breath, it excepts from the exclusion "explosions" of specific "objects," and of others which are "of a kind" with those specified, and then only to " 'objects' covered by this insurance and as described on an Objects [sic] Definitions Endorsement."

Stone's Reply Supp.Summ.J. at 10–11. The Court finds this argument to be entirely without merit. We can find no basis—legal or otherwise—for finding the format as a whole to be confusing or ambiguous. The Policy simply broadly provides for coverage in a section entitled "COVERAGE" and then, in a separate section entitled "EXCLUSIONS," sets out exclusions to coverage and the exceptions to those exclusions. Notwithstanding Stone's characterization of this structure as confusing and convoluted, the Court finds that it is neither. Accordingly, we move on to Stone's next contention.

Stone argues that the expression "an 'object' of a kind described below" is ambiguous, and that Stone is therefore entitled to any reasonable interpretation of the exception that would result in coverage. In this vein, Stone contends that "[i]tems (1) through (5) listed in the exception each involve the transportation and use of steam under pressure . . . as does a digester." Stone's Mem.Supp.Sum.J. at 13. Hence, argues Stone, a digester is "of a kind" of the object enumerated in items (1) through (5).[12]

---

**12.** Stone also suggests that the explosion of Digester # 15 falls within exception (7), which involves the explosion of moving or rotating machinery caused by centrifugal force or mechanical breakdown. Stone contends that the digester should be considered "moving or rotating machinery" because it has steam valves, a ball valve at its bottom (through which the contents of the digester pass after cooking), and a moving mechanism that secures the lid of the digester after the wood chips are loaded. The record cannot support summary judgment in Stone's favor based on the strained and unreasonable contention that the entire digester is a "moving or rotating machine[]." In the first place, the record does not unambiguously support Stone's characterizations of the digester—and under familiar summary judgment standards, all ambiguities must be

resolved in favor of the nonmoving party. For instance, while Stone maintains that the digester has a moving mechanism to secure the hinged lid, the Court can find no support for this assertion in any of the exhibits cited by Stone. *See* DX25, DX26, and DX28. Exhibit DX26, a schematic diagram of the digester and connecting assemblage shows a lid but no securing mechanism; and, DX28, also a schematic diagram, does not even show a lid on the digester. Also, we find no mention of a moving mechanism that secures the lid in the Packer Engineering report's description of the Digester's construction (DX25). We further note that Stone's Pulp Mill Training Manual (DX26) states that "the cover (or cap) is bolted in place," but contains no mention of a moving securing mechanism. In any event, even if—in addition to the bolts that secure the lid—

Before addressing the specific language of the exclusion, we reiterate that in evaluating Stone's contentions, we "must construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes· of the entire contract." *Crum & Forster*, 156 Ill.2d at 391, 189 Ill.Dec. at 761, 620 N.E.2d at 1078. In this regard, Stone emphasizes the following underlying facts in this case. Stone is a major international pulp and paper company engaged principally in the production and sale of paper, packaging products, and market pulp. In the normal course of business at its Panama City facility, Stone uses a series of "pulp digesters," which, during their course of operation, contain wood chips, various "digesting" agents (known as liquors), and buffering agents, which are subjected to steam pressure. It is undisputed that Pulp Digester # 15 was a covered object under the terms of the Policy at issue. It is also apparent ·that HSB was aware that it was insuring the digesters. HSB inspected the Panama City facility and completed a "Risk Evaluation Report" in connection with and prior to issuing the Policy. In describing the pulp mill operations, the Risk Evaluation Report contains specific reference to the batch digesters. Pl.'s Facts, Ex. F at HSB 2579. Stone emphasizes these facts, we may presume, in order to establish its intent to obtain coverage for the explosion of a digester (or at least its reasonable expectation that the policy provided such coverage). *See Hoglund v. State Farm Mut. Auto. Ins. Co.*, 148 Ill.2d 272, 279, 170 Ill.Dec. 351, 354, 592 N.E.2d 1031, 1034 (1992) (stating that an exculpatory clause must be read in conjunction with the policyholder's expectations).[13]

Although we believe that the foregoing facts surrounding the Policy suggest that Stone may have harbored an expectation that digester explosions were covered under poli-

---

there was a "moving" latch of some sort, we cannot conclude that the presence of such a mechanism would allow one to reasonably characterize an entire digester as "of a kind" with moving or rotating machinery.

This holds equally true with respect to the presence of valves, through which steam (or other gases) and the digester's contents are released. Even if the various valves were properly regarded as part of the digester itself—and not part of the assemblage attached to the digester's nozzle necks at the Digester's top head and bottom cone (again, an ambiguity that must be resolved against Stone, the moving party)—this Court could not conclude that the presence of these valves would allow the entire digester to be reasonably characterized as a moving or rotating machine. To the extent that this conclusion conflicts with that of the Oklahoma Supreme Court in *Continental Oil Co. v. National Fire Ins. Co.*, 541 P.2d 1315 (Okla.1975) (finding a heater/cooler to be a machine), we respectfully decline ·to follow that court's analysis.

**13.** We note that although some Illinois appellate courts have rejected the so-called "reasonable expectations" approach to insurance policy interpretations, *see e.g.*, *American Country Ins. v. Cash*, 171 Ill.App.3d 9, 120 Ill.Dec. 834, 524 N.E.2d 1016 (1st Dist.1988); *Insurance Co. of N. Am. v. Adkisson*, 121 Ill.App.3d 224, 76 Ill.Dec. 673, 459 N.E.2d 310 (3d Dist.1984), this statement from the Illinois Supreme Court in *Hoglund* is a good indication that if asked to decide the issue it is likely to rule otherwise. Recently, appellate panels from two Illinois districts have cited *Hoglund's* approach with approval. *See Cummins v. Country Mut. Ins. Co.*, 281 Ill.App.3d 5, 217 Ill.Dec. 240, 244, 666 N.E.2d 909, 913 (5th Dist.1996); *Hall· v. Burger*, 277 Ill.App.3d 757, 764, 214 Ill.Dec. 379, 384, 660 N.E.2d 1328, 1333 (4th Dist.1996). On the other hand, subsequent to *Hoglund*, a first district panel continued to refer to the reasonable expectations approach as one rejected by the courts of Illinois. *General Ins. Co. of Am. v. McManus, Inc.*, 272 Ill.App.3d 510, 209 Ill.Dec. 107, 111, 650 N.E.2d 1080, 1084 (1st Dist.1995). However, the first district panel did not mention *Hoglund* and thus, its blanket assertion that the reasonable expectations approach is rejected in Illinois must be relied on with caution. Although the Supreme Court of Oklahoma recently cited Illinois as one of four states that has rejected the reasonable expectations approach, *see Max True Plastering v. United States Fidelity & Guaranty Co.*, 912 P.2d 861, 864 n. 6 (Okla.1996) that opinion also did not mention *Hoglund*. This Court believes that in the wake of *Hoglund*, the status of the reasonable expectations rule in Illinois is open to genuine question. Although we need not resolve that issue, we will accept the Illinois Supreme Court's admonition that exculpatory clauses must be read in conjunction with the policyholder's reasonable expectations. This statement actually meshes quite well with the Illinois Supreme Court's instruction that policies should be read "as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract." *Crum & Forster*, 156 Ill.2d at 391, 189 Ill.Dec. at 761, 620 N.E.2d at 1078.

cy, they are far from dispositive. In addition to digesters, the Panama City plant also had four steam boilers in operation, as well as four steam turbine generators, which were noted in the Risk Evaluation Report and covered by the policy as well. And, while Stone seems to suggest that the HSB policy's coverage would be illusory if it did not cover digester explosions, that is far from true—steam boiler and steam turbine explosions, for example, would still be expressly covered. Moreover, Stone had a program of insurance divided into several layers and types of coverage (including All Risk coverage), with the HSB Policy being only one of several policies providing coverage for losses exceeding $20 million. In contrast to Stone's arguments, the underwriting materials reflect an intention by HSB not to cover explosions of objects other than those specifically enumerated in items (1) through (7) of the explosion exclusion provision because coverage for explosion of other objects "is more appropriately covered under a Property Named Perils or All Risk policy." Pl.'s Resp., Ex. G at HSB 12350–51. Additionally, while Stone points to certain HSB underwriting material from 1982,[14] which highlights the extreme exposure risk associated with digesters ("Stress corrosion and thinning of the digester shells resulting from caustics in the cooking solution can lead to violent failures"), Pl.'s Resp., Ex. I at HSB 12143, that same underwriting material indicates that policies covering pulp mills must include "Explosion Elimination" provisions.[15] Id. at HSB 12144. Thus, the evidence in the record relating to the type of insurance purchased, the risks undertaken and purchased, the insured subject matter, and the purpose of the policy yields no clear answer to the relevant intent of the parties. Indeed, both parties can find some support in the record for their respective positions concerning whether or not digester explosions were "intended" to be covered by the Policy. In the absence of any unequivocal evidence on the parties' intent, we turn to consider the language of the policy.

Specifically, we now consider the particular language characterized as ambiguous by Stone—namely, the "of a kind" language used in setting out the exceptions to the explosion exclusion. We begin by noting that the Policy does not expressly limit the exception language to the specific items enumerated—for example, by stating, "However, we will pay for loss caused by or resulting from the explosion of one of the 'objects' described below ...: (1) steam boiler; (2) electric steam generator;" etc. Nor does the policy use the following construction, which would lend itself to the conclusion that only the specific enumerated items were excepted from the exclusion: "However, we will pay for loss caused by or resulting from the explosion of one of the 'objects' described below ...: (1) steam boiler of any kind; (2) electric steam generator of any kind; etc." This latter construction could support the interpretation that the qualifier "of a kind" applies only to the item directly preceding it, but even this reading is less than compelled. Instead, by articulating the exception as it does, the Policy lends itself to the reasonable interpretation that each of the enumerated items is simply an exemplar of a broader class of objects which encompasses myriad other exemplars all sharing a common (undefined) characteristic.[16] It is the Policy's fail-

**14.** There is no evidence in the record as to whether this manual was in effect at the time that HSB issued its policy to Stone in 1994.

**15.** The mandatory "Explosion Elimination" wording at that time either (A) affirmatively limited explosion coverage to "[a]ny steam boiler, steam piping, steam turbine, gas turbine, steam engine, or ... machine or electrical apparatus when such loss is caused by centrifugal force or mechanical breakdown" or (B) expressly excluded "loss from an explosion of any Object of a kind described below ... (1) Any fired vessel other than a steam boiler, (2) Any unfired vessel other than an electric steam generator, or (3) Any piping other than steam piping." The artic-

ulated reason for these explosion elimination provisions is that "[g]enerally, the fire carrier picks up explosions other than steam explosions. Boiler and Machinery coverage picks up steam explosions.... The above wordings eliminate overlap with the fire carrier so that a 'joint loss' situation will not arise." Pl.'s Resp., Ex. I at HSB 12147.

**16.** In this regard, Stone notes that the American Heritage Dictionary (2d College ed. 1982) offers the following definitions of "kind": "a class of similar or related individuals" and "a doubtful or borderline member of a given category." Id. at 701. Similarly, the Merriam Webster Dictionary

ure to include any guidance or explanation of how the "of a kind" qualifier is to be understood or applied that gives rise to this internal (or "intrinsic") ambiguity. *Home Ins. Co. v. Chicago & N.W. Trans. Co.*, 56 F.3d 763, 768 (7th Cir.1995) ("A contract may be internally unclear or inconsistent as when it is reasonably and fairly susceptible to more than one meaning and thus intrinsically ambiguous.").

Having determined that the use of the qualifier "of a kind" gives rise to an intrinsic ambiguity, we need not go on to consider Stone's argument that a pulp digester is, in fact, a steam engine. The ambiguity that inheres in the Policy results from the fact that it is entirely unclear how the qualifier is to be applied. It is quite reasonable to read the "of a kind" qualifier as contemplating a broader category encompassing the enumerated item—for example, the category "steam containing pressurized vessels" for the steam boiler item—a category within which a digester squarely fits. Certainly, this would be consistent with Stone's expectations in light of the nature of its business and attendant risks, the type of policy involved, the subject matter that is insured, and the purposes of the entire contract.

None of HSB's arguments render this reading of the "of a kind" language implausible or unreasonable. Indeed, HSB's arguments fail to join issue with the real ambiguity created by the "of a kind" language—namely, how to give effect to that expression. Thus, when HSB argues that "Stone has not demonstrated that the pulp digester falls within any of the seven listed items," it totally sidesteps the reasonable reading of "of a kind" whereby a digester may be "of a kind" with a boiler (even though it is not a boiler) so long as the two objects share a unifying characteristic such as being vessels containing pressurized steam. Thus, the fact that a digester might be regarded as an "unfired pressure vessel" and not a "boiler" is simply not dispositive.

 Additionally, HSB's related contention that the exception identifies seven specific pieces of equipment and that the excep-

tion applies only to these seven pieces of equipment, has the effect of reading the qualifying expression ("of a kind") right out of the contract, a result that cannot be reconciled with this Court's obligation to not render any of the Policy's language meaningless or surplusage. *See Outboard Marine*, 154 Ill.2d at 123, 180 Ill.Dec. at 706, 607 N.E.2d at 1219. Consequently, we must reject HSB's contention that only the seven specific objects enumerated in the exception are excepted from the explosion exclusion.

It is instructive to compare the language of HSB's "Explosion Elimination" provisions (the forerunner to the exclusionary language at issue here) with that of the Policy. Version (A) of the "Explosion Elimination" states in pertinent part: "[T]he Company shall not be liable ... for loss from explosion of an Object other than: (1) Any steam boiler, steam piping, steam turbine, gas turbine, steam engine...." As can be seen, this former language did not include the "of a kind" qualifier at all and thus is fairly read as excepting only the specified objects. Moreover, HSB's departure from this language must be understood as broadening the reach of the exceptions. When HSB intended to be specific it knew how to do so; and, adding the "of a kind" language can only be understood as broadening the exception beyond the specifically enumerated objects.

The alternate wording for the "Explosion Elimination" really brings this point home. Alternate (B) provides in pertinent part: "[T]he Company shall not be liable ... for loss from an explosion of any Object of a kind described below ... (1) Any fired vessel other than a steam boiler, (2) Any unfired vessel other than an electric steam generator,...." Here, the effect of the "of a kind" language is evident: it applies to broad classes of objects (*e.g.* fired vessels, unfired vessels, etc.), and, when a specific object from the class was intended to be excluded it was specifically identified (*e.g.*, "other than a steam boiler"). Finally, we note that the language "Any unfired vessel other than an electric steam generator" illustrates that classifying an unfired vessel (such as a diges-

410 (New ed. 1994) defines "kind" as a "group united by common traits or interests."

ter) and a steam generator together is not without some basis.

For all of the foregoing reasons, we conclude that the scope of the Policy's explosion exclusion exceptions is rendered ambiguous by virtue of the "of a kind" qualifier. Confronted with this ambiguity, this Court must apply the rule of *contra proferentem*, strictly construing the phrase against the insurer and in favor of the insured.[17] The Seventh Circuit has observed that "[t]his rule of strictly construing ambiguous provisions against the insurer is most rigorously applied in the case of ambiguous exclusionary provisions in which the insurer seeks to limit its liability." *Playboy Enters., Inc. v. St. Paul Fire & Marine Ins. Co.*, 769 F.2d 425, 428 (7th Cir.1985). In the instant case, this Court has extensively reviewed the voluminous evidentiary submissions in this case and finds that none of them help to disambiguate the "of a kind" qualifier in the exclusionary provision. In view of this impasse, the rule of *contra proferentem* dictates that the words be given any reasonable interpretation that favors the insured. As we have explained above, a reasonable reading of the exclusion provision is that the enumerated objects represent tokens or exemplars of broader types or classes of objects (this is most plainly evident with item (7)—moving or rotating

machinery—which does not even purport to designate an object), and that a specific object such as a digester is exempt from the exclusion if it fits into one or more of those broader classes of objects. Further, we find it reasonable to comprehend one of those classes to encompass vessels—including digesters—that contain steam under pressure. Accordingly, applying the rule of *contra proferentem*, we conclude that the Policy must be construed to except the digester from the explosion exclusion, and that Stone is entitled to coverage for the Panama City Incident.[18] Stone's motion for summary judgment is therefore granted.

## CONCLUSION

Defendant Hartford Steam Boiler Inspection and Insurance Company's motion for summary judgment is granted in part and denied in part as follows: To the extent that HSB's motion sought a determination that the term "explosion" as used in the Policy was unambiguous and applied to the Panama City Incident, the motion is granted.[19] However, this determination does not entitle HSB to the entry of judgment in its favor; thus, to the extent that the motion sought entry of such a judgment, it is denied.

17. HSB suggests at various points in its submissions that in the event that the Court finds any provision of the Policy to be ambiguous, the Court must allow further proceedings in order to receive extrinsic evidence bearing on the meaning of the challenged terms. HSB is correct, of course, that the rule of *contra proferentem* is a rule of last resort that is to be relied on only after other interpretive aids have failed to disambiguate the ambiguous language. *Baker v. America's Mortgage Servicing Corp.*, 58 F.3d 321, 327 (7th Cir.1995); *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 364 (7th Cir.1990); *Bunge Corp. v. Northern Trust Co.*, 252 Ill.App.3d 485, 493, 191 Ill.Dec. 195, 201, 623 N.E.2d 785, 791 (4th Dist.1993). However, HSB was well aware of Stone's ambiguity arguments and had every opportunity to present whatever extrinsic evidence it thought might be relevant to the "of a kind" ambiguity. None of its evidence shed any light on the parties' intent in using this language; and we will not countenance a piecemeal approach to this litigation. Also, we note that HSB's Rule 56(f) affidavit did not address the "of a kind" ambiguity. Finally, because the "of a kind" ambiguity is intrinsic (that is, it derives from the language itself rather than from some

intended specialized meaning of the language), we can see no benefit to taking any additional evidence. *See Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 314 (7th Cir.1992) (finding the term "mental illness" to be ambiguous and denying insurer's request for a remand for further evaluation of extrinsic evidence).

18. HSB's reliance on Paragraph B.4.b. of the Policy, which excludes loss caused by or resulting from an "explosion that occurs at the same time as an 'accident,' or that ensues from an 'accident,'" is unavailing. The accident at issue here *was* the explosion; the explosion did not occur at the same time as a separate and distinct accident nor did it ensue from such an accident. Accordingly, Paragraph B.4.b is inapplicable.

19. In responding to Stone's summary judgment motion, HSB filed a Fed.R.Civ.P. 56(f) affidavit indicating that additional discovery would be required as to the meaning of the term "explosion" in the event that the Court found that term to be ambiguous and denied HSB's motion for summary judgment. The Court's ruling on HSB's motion moots the Fed.R.Civ.P. 56(f) affidavit.

Plaintiff Stone Container Corporation's motion for summary judgment is granted in part and denied in part as follows: To the extent that Stone's summary judgment motion sought a determination that the term "explosion" was ambiguous, the motion is denied. However, to the extent that Stone sought a determination that the exclusionary provisions of the Policy were ambiguous and must be construed in Stone's favor, thus requiring judgment for Stone, the motion is granted. Accordingly, the Court enters judgment in favor of Stone declaring that coverage exists under Boiler and Machinery Coverage Policy No. 7710440 for the "Property Losses," "Consequential Damages," and the "Combined Business Interruption and Extra Expense" losses suffered by Stone arising out of the Panama City Incident.